STATE OF NORTH CAROLINA v. ALLEN RAY HARDISON

No. 377A88

(Filed 13 June 1990)

1. **Homicide § 30.3 (NCI3d) — murder — refusal to submit involuntary manslaughter — no error**

    The trial court committed harmless error in a murder prosecution by denying defendant's request for jury instructions on involuntary manslaughter. The jury was instructed on first and second degree murder and voluntary manslaughter, and obviously rejected the theory of an unintentional killing because it found defendant guilty of first degree murder on the theory of premeditation and deliberation. To reach that verdict, the jury was required to find a specific intent to kill with premeditation and deliberation, which would preclude a finding that the killing occurred as a result of criminal negligence or accident.

    **Am Jur 2d, Homicide §§ 498, 530, 531.**

2. **Criminal Law § 490 (NCI4th) — murder — publicity during trial — no mistrial**

    The trial court did not err in a murder prosecution in its questioning of jurors who had been exposed to a newspaper headline or in failing to declare a mistrial because of that exposure where, after determining that four jurors had seen the headline and none had read the article, the trial judge asked the jurors whether seeing the headline had influenced or prejudiced them or would have any effect on them; their

STATE v. HARDISON

[326 N.C. 646 (1990)]

unanimous answer was no; the judge instructed the jurors that the headline was not evidence in the case, had nothing to do with the case, and was of a prejudicial nature; the court again asked the jurors if they felt that what they happened to see would influence them in any way; the unanimous response was again no; and defendant made no motion for a mistrial.

**Am Jur 2d, Criminal Law § 690.**

3. **Criminal Law § 498 (NCI4th) — murder — juror's notes — motion that notes not be allowed in jury room — denied — no error**

The trial court did not err during a murder prosecution by overruling defendant's objection and request that a particular juror not be allowed to take into the jury room written notes that the juror had taken during the trial. N.C.G.S. § 15A-1228 specifically authorizes jurors to make notes and to take them into the jury room for use during their deliberations, except that upon objection of any party the judge must instruct the jurors that notes may not be taken. The statute does not purport to govern the use of the notes after they have been taken.

**Am Jur 2d, Trial § 934.**

4. **Criminal Law § 50 (NCI3d) — murder — testimony of SBI agent as to statement to defendant — not opinion testimony**

The trial court did not err in a murder prosecution by allowing an SBI agent to testify that he had told defendant that he did not believe defendant had been truthful in his first statement. The challenged testimony was in direct response to a question which did not call for an opinion and no opinion was given, so there was no question of admissibility under N.C.G.S. § 8C-1, Rule 701. Even if such evidence was inadmissible under Rule 701, defendant cannot demonstrate prejudice.

**Am Jur 2d, Expert and Opinion Evidence §§ 5-10.**

5. **Constitutional Law § 48 (NCI3d) — murder — effective assistance of counsel**

Defendant in a murder prosecution was not denied the effective assistance of counsel under the United States or the North Carolina Constitutions because his trial counsel did not request recordation of jury selection, the bench conferences, and the opening and closing arguments of counsel. N.C.G.S.

STATE v. HARDISON

[326 N.C. 646 (1990)]

§ 15A-1241(a) did not require that the selection of the jury in this noncapital case be recorded and defendant does not assign any error regarding the selection of the jury in this case; the same is true of the opening statements and closing arguments of counsel; and defendant has made no attempt to reconstruct the record of any particular bench conference and makes no specific allegations as to a particular conference.

**Am Jur 2d, Criminal Law §§ 752, 753, 984, 985.**

APPEAL as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment of *Griffin (William C.), J.,* sentencing defendant to life imprisonment upon his conviction of first-degree murder by a jury at the 31 May 1988 Criminal Session of Superior Court, BEAUFORT County. Heard in the Supreme Court 16 November 1989.

*Lacy H. Thornburg, Attorney General, by Jane P. Gray, Special Deputy Attorney General, for the State.*

*Thomas C. Manning for defendant-appellant.*

MEYER, Justice.

In a noncapital trial, defendant was convicted of first-degree murder in the shooting death of his father-in-law, Frederick W. Sheppard, and was sentenced to life imprisonment. We conclude that defendant received a fair trial free of prejudicial error and affirm his conviction and sentence.

The evidence presented at trial by the State tended to show that on 24 September 1987 at approximately 7:22 p.m., Deputy Sheriff Jerry Langley of the Beaufort County Sheriff's Department responded to a radio report of a shooting and went to the farm of Frederick Sheppard. When he got to the farm, defendant was standing with his brother-in-law at the end of a road to the farm, waving his arms to get the attention of the rescue squad immediately behind Deputy Langley. When defendant and his brother-in-law got into the deputy's car, defendant stated that he was the one who had called and that he was the one who had done the shooting. As defendant directed the deputy to the scene, he told the deputy that he had shot his father-in-law, Sheppard, and warned the deputy that Sheppard had a gun.

Upon arriving at the scene of the shooting, they found the victim lying next to his van in a prone position, with his legs slightly turned under him. A .45 automatic pistol with the slide pulled back and an empty clip in it was found under the victim's right arm. On his arm was a holster with a belt attached. A knife case containing a knife was found below his left elbow. An ammunition pouch containing two clips was found under the victim's right hand, and a set of keys was in his left hand. A .30-caliber carbine was found in Sheppard's van. Three spent shells from the .45 were found at the scene. Defendant's .357 Ruger magnum revolver, which contained four live rounds and two spent cartridges, was later retrieved from defendant's car.

Deputy Langley testified that defendant first stated to him that at about 7:00 p.m., after unsuccessfully attempting to locate and talk to Elwood Cherry, a neighbor, about some farm equipment that was for sale in the area, he arrived at his Beaufort County home, which was approximately nine-tenths of a mile from the scene of the shooting. Upon arriving home, defendant related that he heard some shooting; got his .357 magnum, which was already loaded; told his wife he would be back in a little while; and went to find Sheppard, who had stopped by his house before going to the field to do some farm work. Defendant stated to Deputy Langley that he went to talk to Sheppard about the farm equipment that was for sale. He heard Sheppard at the back side of the field, and since it appeared that he was going to be there for a while, defendant left to try to locate Cherry and check on the farm equipment. Defendant then went to the field where Sheppard was working.

Defendant told Deputy Langley that when he returned to the field, Sheppard was still cutting land with his tractor. After parking his car, defendant waved to Sheppard, who began driving the tractor from the field onto the path. Defendant got back in his car and moved it so that Sheppard could have room to park the tractor near his van for refueling. Defendant told Sheppard that he was doing a good job of cutting the field, and Sheppard responded that if it did not rain, he would get the entire field cut. Defendant stated that he made other comments but that Sheppard did not respond. When defendant and Sheppard reached the van, Sheppard said, "I'll show you." Defendant related that Sheppard pushed the door of his van open with his left arm; brought around his right hand, in which he wielded a gun; and began accusing defendant

of cutting his tires and stealing fuel from him. Sheppard was shaking with anger and threatened to kill defendant.

Defendant stated that he grabbed Sheppard's hand and that the gun discharged, the projectile passing by defendant's head and shattering the glass in the passenger door of the van. The two men struggled while Sheppard again threatened to kill defendant. Defendant then pulled his own gun and shot the victim in the shoulder to stop him but not to kill him. When Sheppard fell to the ground, defendant reached for him to keep him from falling. The victim's hand with the gun in it then came around, and defendant fired his own gun at the same time that Sheppard's gun discharged. Defendant told Deputy Langley that the second shot hit Sheppard "where [defendant] was looking which was his face." Defendant then left and called the rescue squad and the Sheriff's Department.

This first statement was made to Deputy Langley orally after he arrived at the scene on 24 September and again at the Sheriff's Department to Deputy Langley and Investigator Donald Deese. It was reduced to writing by Deputy Langley at the Sheriff's Department and was read to defendant to assure that he agreed with it, but it was not signed by defendant. On 9 October 1987, defendant gave in substance the same statement to SBI Agent Bill Thompson at the SBI office in Greenville. Defendant indicated at that time that the second time his gun discharged, he had tensed up in response to the victim's gun discharging and that he had neither aimed his own gun nor realized it had discharged.

Agent Thompson told defendant that he did not think he was telling the truth. At that time, defendant became upset and asked that Deputy Langley be brought into the room. Defendant then, in yet another statement, related to both Agent Thompson and Deputy Langley that when he first went to the field, Sheppard got off his tractor, pulled his gun, began cursing at him and accusing him of stealing fuel and cutting his tires, and while brandishing a .45-caliber pistol, threatened to kill him. Sheppard accused defendant and his family of being a burden and said he was going to kill defendant and the entire family. Defendant turned and began to run. When he looked back, Sheppard was pulling the trigger, but the gun did not go off. He then saw Sheppard with both hands on the gun, as if trying to reload it. When defendant got into his car to leave, Sheppard was shooting a gun at him. Defendant

drove home, fearing that Sheppard would follow him and kill his family. When defendant arrived at his home, Elwood Cherry drove by. Defendant thought it was Sheppard, so he threw up his hands to stop him. After Cherry waved and drove past, defendant got his own gun and returned to the field to stop Sheppard from coming to his house to kill his family. Defendant stated that the actual shooting then occurred as he had previously related.

The State also offered the testimony of Jorj Robert Head, a twenty-two-year-old student at East Carolina University who, on the day of the shooting, was hunting deer on a nearby farm. Head testified that he had heard some farm machinery running, and at about 7:00 he heard loud voices which he thought were two men arguing. He then heard five consecutive, identical shots. Head testified that a couple of minutes later, he heard two additional shots, followed by a pause, and then two more shots. He could not tell what kind of weapon fired the shots, but he said they did not sound like they came from a rifle or a shotgun. It was later determined that the deer stand where Head was located when he heard the arguing and shots was approximately three hundred yards from where Sheppard was shot.

SBI Special Agent Ronald Marrs, a firearms and tool mark examiner, testified that the three .45-caliber cartridge cases found at the scene of the shooting had been fired from the .45-caliber automatic pistol found in the victim's hand and that the gun had a trigger pull of between five and one-half to six pounds. The .45 had a clip that holds seven rounds, and when the last round is fired, the slide automatically locks in the open position. It was stipulated by the parties that the two .357 cartridges retrieved from defendant's gun had been fired from that gun, and the agent testified that that gun had a trigger pull of four to four and three-fourths pounds. Agent Marrs further testified that due to the condition of the victim's clothing, in his opinion, the shot to Sheppard's body had been a contact or near-contact gunshot.

Dr. Stan Harris, a forensic pathologist and teacher of clinical pathology at the East Carolina University School of Medicine, performed an autopsy on the deceased. Dr. Harris described finding a wound to the right of the victim's mouth and a wound to the upper left wall of the chest near the shoulder. He indicated that the bullet which produced the wound to the mouth deviated only slightly from a horizontal plane, went through the brain stem,

and exited the back of the head. In his opinion, this bullet was fired from at least a foot away. Dr. Harris stated that the bullet wound to the brain would have been immediately fatal and was the cause of death. Dr. Harris stated that the wound to the chest was the first to be inflicted, and the wound to the face was the second. Dr. Harris testified on cross-examination that the injury to the chest near the shoulder could possibly have resulted in involuntary actions causing a gun to be fired in a reflexive action.

Defendant testified in his own defense, essentially repeating the statement he gave to SBI Agent Thompson and Deputy Langley on 9 October 1987. Defendant testified that his father-in-law had an extremely violent temper and that he exhibited uncontrollable anger towards his immediate family. He said that on the day of the shooting, he arrived home from work at approximately 4:00 to 4:30 p.m. Sheppard had come by defendant's house about 5:15 to 5:30 p.m., but defendant and Sheppard did not speak. Sheppard left defendant's home and went down to the field. Shortly after 6:30 p.m., defendant's wife came home, and he left to attempt to find Elwood Cherry to go look at a truck and a combine that were for sale. When he could not find Cherry, defendant went to the field where Sheppard had been cutting his land. Sheppard was sitting in the corner of the field, behind his tractor, and appeared to be having "problems," so defendant began walking toward him. When Sheppard saw defendant, he threw up a hand, and defendant waved at him. Sheppard then drove his tractor toward his van, and defendant returned to his car and moved it out of the way.

Defendant testified that Sheppard got out of the tractor, immediately pushed the gun in defendant's face, and started cursing him and accusing him of stealing fuel and cutting his tires. Defendant denied the accusations, but Sheppard got madder and stated that he was going to kill defendant and the whole family. Defendant ran to his car and drove home, during which time Sheppard was shooting at him.

At his home, defendant heard an automobile coming down the road at a fast pace. Thinking it was Sheppard, he turned and threw up his hands to stop Sheppard. However, the vehicle approaching was a truck being driven by Elwood Cherry. Defendant testified that Cherry apparently thought defendant was waving and waved in return as he passed defendant.

Defendant testified that he got his gun and holster from his mobile home, strapped it on his belt, and told his wife that he was going back down to the field. He was afraid his father-in-law would come to his house and carry out his threat, and defendant wanted to reason with him. When defendant arrived at the field and got out of his car, Sheppard was standing by his van. Sheppard immediately began cursing as defendant approached him. Sheppard turned his back to defendant and was handling something on the front seat of his van. Defendant told Sheppard that they had to talk about things. Sheppard and defendant argued, and Sheppard pointed a gun at defendant, stating that he was going to kill him. Defendant grabbed Sheppard's hand which held the gun, and Sheppard fired the gun, missing defendant. The two men struggled, and defendant pulled his own gun and shot Sheppard in the shoulder.

Defendant testified that Sheppard then fell to the ground on his back, and as defendant bent down to help him up, Sheppard's right arm came up. Defendant tensed and, without aiming, discharged his gun, the bullet striking Sheppard in the face. Defendant then returned home and called the Sheriff's Department and the rescue squad. At his brother-in-law's urging, while the two waited for the authorities to arrive, defendant put the pistol in the car at his home. Defendant further testified about prior threats he had received from the deceased and prior acts of violence on the deceased's part.

On both direct and cross-examination, defendant testified that, in his first statement, he did not tell Deputy Langley about going back for the gun or about Sheppard shooting at him a number of times as he was fleeing the scene after the first confrontation. Defendant testified on cross-examination that he did not tell Agent Thompson that he went back for the gun. Defendant stated that what he told them was basically what he could "put together" and that when he calmed down and put everything together, "[i]t was just tearing [him] apart inside" knowing he had not told Deputy Langley about going to the house to get the gun. After being told by Agent Thompson that he did not believe defendant was telling the whole truth, defendant testified that he became upset and wanted them to know all the details and that that was why he told them a different story.

Defendant further offered the testimony of family members and neighbors as to the violent reputation of the deceased and as to his own good character.

STATE v. HARDISON

[326 N.C. 646 (1990)]

Defendant was convicted of first-degree murder on the theory of premeditation and deliberation and was sentenced to life imprisonment.

[1] Defendant first contends that the trial judge erred in denying his request for a jury instruction on involuntary manslaughter. The trial court submitted for the jury's consideration verdicts of first-degree murder based upon premeditation and deliberation, of second-degree murder, of voluntary manslaughter, and of not guilty. The trial court further charged on the theory of self-defense. The State contends that even if defendant's evidence would support an instruction on involuntary manslaughter, any error in failing to give such an instruction was harmless in view of defendant's conviction of first-degree murder based on premeditation and deliberation. We agree. Our recent decision in *State v. Young*, 324 N.C. 489, 380 S.E.2d 94 (1989), is dispositive of this assignment of error. In *Young*, we held that where, as here, a jury is properly instructed on the elements of first- and second-degree murder and thereafter returns a verdict of guilty of first-degree murder based on premeditation and deliberation, it is harmless error not to have instructed on the issue of involuntary manslaughter even where the evidence would have supported such an instruction. The defendant in *Young* was charged with the first-degree murder of his wife. He contended the shooting was an accident. The jury was given instructions on possible verdicts of first-degree murder, second-degree murder, or not guilty. The defendant requested and was denied instructions on voluntary and involuntary manslaughter. He was found guilty of first-degree murder on the theory of premeditation and deliberation. On appeal, he conceded there was no evidence to support a charge on voluntary manslaughter but contended he was entitled to an instruction on involuntary manslaughter. This Court found that even if it were error to have failed to charge on involuntary manslaughter, the error was harmless because the jury was given correct instructions on first- and second-degree murder, and the jury found him guilty of first-degree murder based on the theory of premeditation and deliberation. *Id.* at 492, 380 S.E.2d at 96. *See also State v. Vaughn*, 324 N.C. 301, 309, 377 S.E.2d 738, 742 (1989). This Court expressly overruled prior decisions that stated or implied that in such situations the failure to charge on involuntary manslaughter was not harmless. Our rationale was that the jury was instructed that it could not find the defendant guilty of first-degree murder unless it found beyond

a reasonable doubt that he formed the specific intent to kill the victim, that he formed the intent for some amount of time beforehand, and that he carried out that intent in a cool state of mind. In finding the defendant guilty of first-degree murder, the jury necessarily rejected the theory of an unintentional killing. Therefore, had an instruction on the lesser charge been given, there is no possibility the jurors would have considered it since they found him guilty of the greater offense. *State v. Young*, 324 N.C. at 494, 380 S.E.2d at 97. In the case *sub judice*, the jury was similarly instructed on first- and second-degree murder and also voluntary manslaughter. This jury obviously rejected the theory of an unintentional killing because it found defendant guilty of the first-degree murder of Fred Sheppard on the theory of premeditation and deliberation.

In his reply brief, defense counsel, with admirable candor, concedes that *Young* does indeed stand for this proposition but urges us to reconsider our holding in that case or to limit that holding to the circumstance where the defense is "accident." Defendant contends that, in the present case, the evidence is susceptible of a finding by the jury that the conduct of the defendant was criminally negligent, that is, wanton and reckless negligence, which would serve as the basis for a verdict of involuntary manslaughter. We disagree. To reach its verdict of first-degree murder on the theory of premeditation and deliberation, the jury was required to find a specific intent to kill, formed with premeditation and deliberation, which would preclude a finding that the killing occurred as a result of criminal negligence, just as it would preclude a finding that it occurred by accident. We reaffirm our holding in *Young*. As in *State v. Young*, 324 N.C. 489, 380 S.E.2d 94, assuming error in not giving a charge on involuntary manslaughter, it was harmless in view of the verdict of first-degree murder on the theory of premeditation and deliberation. Our recent case of *State v. Thomas*, 325 N.C. 583, 386 S.E.2d 555 (1989), in which we held that it was reversible error to fail to submit the alternative verdict of involuntary manslaughter in a first-degree murder prosecution submitted only on the theory of *felony murder*, is inapposite. This assignment of error is overruled.

[2] Defendant next contends that the trial judge committed plain error in failing to adequately question four jurors who had been exposed to a newspaper headline and in failing to declare a mistrial because of that exposure. The headline in question was "*After*

*Polygraph Test*: AGENT: HARDISON ALTERED STORY." · Beneath the headline was an article of three columns in width, which was continued in two column widths on another page. The article reported that defendant had changed his account of the events after being administered a polygraph examination and contained a summary of the trial proceedings up to the time the story was written. The newspaper publicity of the trial was brought to the attention of the trial judge the morning after the article appeared, following an overnight recess after all the evidence had been presented and just prior to counsel's closing arguments to the jury and the jury charge. The matter is reported in the trial transcript as follows:

THE COURT: . . . . There is something that was brought to my attention this morning, I made [sic] need to speak to the jury about that. Let me inquire of you first. (All counsel approached the bench and conferred with the court out of the hearing of the jury.)

THE COURT: Members of the jury, it has been brought to my attention this morning that apparently there was some media attention in the local press to this matter last evening and I would like to make an inquiry of you right now if anybody happened to see that? Apparently, from what I have been told it was arranged in such a fashion that if you picked up the paper, you couldn't hardly help but see it.

I would like to make an inquiry, again, this isn't a criticism of anybody. It is the sort of thing that happens and I would like to ask anybody if they happened to see that particular headline in the paper last night.

It appeared to be rather, there were several of them.

JUROR: I saw the headline but I just chose not to read the article.

THE COURT: Let me ask, anybody read that article[?] As it has been told to me that it appeared that you couldn't hardly help but see. Anybody happen to read the article?

JURY IN UNISON: No.

THE COURT: Let me make a further inquiry. Anybody prejudiced or influenced or had any—those of you who happened to see it, I believe there were four of you. Do you

STATE v. HARDISON

[326 N.C. 646 (1990)]

feel like what you saw will have any effect whatsoever in this case?

JURY IN UNISON: No.

THE COURT: I'll specifically instruct you that that is not evidence in this case. Has nothing to do with this case. As a matter of fact, the way it was characterized to me was clearly a bias type, prejudicial type. I think that would be the only way to characterize it.

I would make a further observation—well, let me ask you this question, is anybody with the press in the courtroom?

MR. NORTON: Yes, sir, there is.

THE COURT: Of course, we live in a free society. All I can do is ask you not to read those. I appreciate the fact that you all didn't read it.·

I'm sorry it was arranged in such a fashion that you couldn't help but see it if you picked up the paper.

Any of you that happened to see it feel like that what you saw would, in any way, influence you whatsoever?

JURY IN UNISON: No.

It thus appears that four jurors saw the headline; that, in accordance with the judge's prior admonishments, none of them read the article; and that seeing the headline did not influence any of the four jurors in any way. Defendant made no motion for a mistrial but now contends that the exposure of the four jurors to the headline was so prejudicial that the trial judge should have declared a mistrial *ex mero motu*. He further contends that the trial judge's failure to make a more detailed inquiry resulted in the denial of a fair trial. We disagree. Assuming, without deciding, that the issue is properly before us in spite of defendant's failure to preserve it for appellate review by moving for a mistrial in accordance with Rule 10(b) of the North Carolina Rules of Appellate Procedure, we find no error.

Whether a motion for mistrial should be granted is a matter which lies within the sound discretion of the trial judge. "[A] mistrial is appropriate only when there are such serious improprieties as would make it impossible to attain a fair and impartial verdict under the law." *State v. Calloway*, 305 N.C. 747, 754, 291 S.E.2d

622, 627 (1982) (citing *State v. Chapman*, 294 N.C. 407, 241 S.E.2d 667 (1978)). Pursuant to N.C.G.S. § 15A-1061, upon motion of defendant, or with his concurrence, a trial judge *may* declare a mistrial at any time during trial. He *must* do so upon proper motion only "if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case." N.C.G.S. § 15A-1061 (1988). Such was not the case here. After determining that four jurors had seen the headline and that none had read the article, the trial judge asked the jurors whether seeing the headline had influenced or prejudiced them or would have any effect on them whatsoever. Their unanimous answer was "no." The trial judge then instructed the jurors that the headline was not evidence in the case, had nothing to do with the case, and characterized it as being of a prejudicial nature. He then again asked the jurors if they felt that what they happened to see would influence them in any way, and again their unanimous response was "no." We conclude that this was an adequate and sufficiently detailed inquiry and did not deny defendant a fair trial. Nor do we find any abuse of discretion in failing to declare a mistrial.

[3] Defendant next argues that the trial judge erred in overruling his objection and request that a particular juror not be allowed to take into the jury room written notes that the juror had taken during the trial. The objection was made after the jury instructions were completed and after the jury was already in the jury room with the notes but before the jury began its deliberations. The record does not reveal any objection to any juror taking notes at any time prior thereto. N.C.G.S. § 15A-1228 provides as follows:

> Jurors may make notes and take them into the jury room during their deliberations. Upon objection of any party, the judge must instruct the jurors that notes may not be taken.

N.C.G.S. § 15A-1228 (1988). This legislation specifically authorized jurors to make notes and to take them into the jury room for use during their deliberations *unless* there is an objection by a party, in which event the judge must instruct the jurors that they may not take notes. We note that a party, by proper objection made in apt time, may require an instruction that notes may not be taken; it does not purport to govern the use of the notes after they have been taken. Had the legislature desired to do so, it could easily have provided that, upon objection, such notes could

not be taken into the jury room. That the legislature knew how to formulate the proper language to do just that is obvious from the first sentence of the statute in that it specifically authorized jurors' notes to be taken "into the jury room during their deliberations." While an objection in apt time to the taking of the notes could have prevented them from being taken, an objection coming after they had already been taken and after the jury had left the courtroom came too late.

Defendant also contends in the caption to one of his questions presented for review that the overruling of his objection as to the juror's notes denied him his constitutional rights under both the federal and state Constitutions "to a fair trial and due process of law." He does not, however, brief any constitutional issue in that regard. He, likewise, does not contend or argue in any way that the statute, N.C.G.S. § 15A-1228 (1988), is unconstitutional. Had defendant contested the constitutionality of the statute at trial and briefed the issue before this Court on his appeal, we would have been presented with a more serious problem. *See, e.g., State v. Stocks*, 319 N.C. 437, 443, 355 S.E.2d 492, 495 (1987) (Martin, J., concurring opinion).

[4] Defendant next contends that the trial court erred in allowing SBI Agent Thompson to testify that he (Thompson) told defendant that he did not believe defendant had been truthful in his first statement to Thompson. Defendant argues that, although it was not elicited as opinion evidence, Thompson's testimony constituted improper and incompetent opinion testimony. We disagree. The testimony in question occurred during the questioning of Agent Thompson by the prosecutor:

Q. Now after Mr. Hardison gave you that statement . . . , what, if anything, did you say to Mr. Hardison at that time?

A. I told Mr. Hardison that I didn't think he was telling me the complete truth.

MR. VOSBURGH: Object, move to strike.

THE COURT: Objection overruled. Motion denied.

Q. What did he say to you at that time?

A. At that time, he didn't really reply in any way to that directly . . . .

     . . . .

Q. Did you take a further statement from Mr. Hardison at that time?

A. Yes, sir.

Q. What did he tell you had occurred the second time after you told him he hadn't told you the complete truth?

Agent Thompson then related the contents of defendant's second statement.

It is clear that the challenged testimony was in direct response to the question, "[W]hat, if anything, did you say to Mr. Hardison at that time?" The response was a statement: "I told Mr. Hardison that I didn't think he was telling me the complete truth." The question did not call for an opinion, and none was given. No question of admissibility of opinion testimony under Rule 701 of our Rules of Evidence arises. Even if such evidence was inadmissible under Rule 701, however, defendant cannot demonstrate prejudice by its admission. It was defendant himself who, much earlier in the trial, first elicited from Deputy Langley during cross-examination the fact that the defendant's first and second statements were inconsistent:

Q. And did he give you a second statement which in any way conflicted with the first one that was given?

A. Yes, he did.

Q. What was the statement that he gave you the second time?

Deputy Langley was thereafter allowed to relate the contents of the second statement. Later, as indicated above, Agent Thompson testified as to the contents of the second statement. Even the defendant himself testified that he gave two statements and gave an explanation as to the inconsistencies in the two. Defendant cannot meet the burden of showing that, absent the contested testimony by Agent Thompson, there is a reasonable possibility that the jury would have reached a different result. N.C.G.S. § 15A-1443(a) (1988).

[5] Finally, defendant contends that he was denied the effective assistance of counsel under both the United States and the North Carolina Constitutions because his trial counsel did not request recordation, stenographically or otherwise, of the jury selection,

the bench conferences, and the opening and closing arguments of counsel.

The test for determining whether the defendant has received effective assistance in a criminal case is set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674 (1984), and adopted by this Court in *State v. Braswell*, 312 N.C. 553, 324 S.E.2d 241 (1985), as the uniform standard to be applied under the North Carolina Constitution:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, *a trial whose result is reliable.* (Emphasis added.)"

*State v. Braswell*, 312 N.C. at 562, 324 S.E.2d at 248 (quoting *Strickland v. Washington*, 466 U.S. at 687, 80 L. Ed. 2d at 693).

The defendant attempts to meet the first test by showing that his counsel failed to request a transcript of all proceedings. He relies on N.C.G.S. § 15A-1241(a), which provides:

> (a) The trial judge must require that the reporter make a true, complete, and accurate record of all statements from the bench and all other proceedings except:
>
> > (1) Selection of the jury in noncapital cases;
> >
> > (2) Opening statements and final arguments of counsel to the jury; and
> >
> > (3) Arguments of counsel on questions of law.

N.C.G.S. § 15A-1241(a) (1988).

In the plain words of the statute, it is not required that the selection of the jury in this noncapital case be recorded, and defendant does not assign any error regarding the selection of the jury in this case. The same is true of the opening statements and closing arguments of counsel. As to the "bench conferences," the record in this case reflects a number of bench conferences between judge and counsel. Defendant has made no attempt to reconstruct the record of any particular bench conference and indeed makes no

specific allegations as to a particular conference. Rather, he argues that several of the bench conferences reflected in the transcript of the trial "may have been critical to the Defendant's rights" and that, without a transcript of every aspect of the trial, "it is impossible to effectively evaluate what possible appellate issues might be advanced." Defendant's arguments in this regard fall far short of satisfying the burden set forth in *Strickland*, 466 U.S. 668, 80 L. Ed. 2d 674, and *Braswell*, 312 N.C. 553, 324 S.E.2d 241.

Defendant received a fair trial free of error.

No error.