STATE OF NORTH CAROLINA v. JOHNNY CARL RUSH

No. 250A94

(Filed 5 May 1995)

**1. Evidence and Witnesses § 2567 (NCI4th)— first-degree murder—statements of defendant's spouse to 911 dispatcher—admissible**

There was no plain error in a first-degree murder prosecution in the admission of statements made by defendant's spouse to a 911 dispatcher on the night of the murder. The sole prohibition of N.C.G.S. § 8-57(b) is directed to compelled testimony and does not address out-of-court statements made by a spouse and introduced against a defendant spouse through a third party; moreover, defendant concedes that these statements were not confidential. Under the common law rule not covered by the statute, allowing the admission of nonconfidential, out-of-court statements made by a spouse and introduced against the defendant spouse for the State through a third party promotes the administration of justice without infringing on the confidence of the marital relationship.

**Am Jur 2d, Witnesses §§ 242, 253-255.**

**2. Evidence and Witnesses § 761 (NCI4th)— first-degree murder—statements by defendant's spouse to 911 dispatcher—weight of other evidence—not prejudicial**

There was no prejudice in a first-degree murder prosecution in the admission of statements by defendant's spouse to a 911 dispatcher where, assuming error, the evidence establishing premeditation and deliberation was overwhelming and it could not be said that absent these comments the jury would have reached a different result.

**Am Jur 2d, Appeal and Error § 806.**

**3. Evidence and Witnesses § 761 (NCI4th)— first-degree murder—statement by defendant's wife to police—not prejudicial**

There was no prejudice in a first-degree murder prosecution in allowing the State to ask defendant on cross-examination about a pretrial statement made by defendant's spouse to police involving her screaming to defendant as he left their house not to

**STATE v. RUSH**

[340 N.C. 174 (1995)]

do it and to think of their son. Although defendant argued that the statement was within spousal privilege, the statement was competent and nonconfidential and, assuming that the question was improper because the prosecutor knew from voir dire that defendant had not heard the statement, there was plenary other evidence of premeditation and deliberation and no reasonable possibility that this single question, to which defendant gave a negative response, impacted the jury's verdict.

**Am Jur 2d, Appeal and Error § 806.**

### 4. Evidence and Witnesses § 2877 (NCI4th)— first-degree murder—cross-examination—fabricated defense

There was no error in a first-degree murder prosecution where the court overruled defendant's objections to questions asked by the prosecutor to defendant on cross-examination concerning the fabrication of a defense. Defendant's trial testimony differed from his prior accounts of the shooting to deputies and the prosecutor sought to attack defendant's credibility through defendant's inability to reconcile his testimony with his earlier statements. His first question was a proper attempt to expose a fabricated defense and his second was simply a vigorous cross-examination properly designed to discredit defendant's belated self-defense theory. Counsel is given wide latitude and has the right and duty to cross-examine vigorously a defendant who takes the stand in his own defense.

**Am Jur 2d, Witnesses §§ 811 et seq.**

### 5. Homicide § 558 (NCI4th)— first-degree murder—self-defense instructions—voluntary manslaughter as lesser offense

There was no error in a first-degree murder prosecution where defendant contended that the court's self-defense instructions incorrectly allowed a verdict of guilty of voluntary manslaughter based on a defense of imperfect self-defense only if defendant reasonably believed it was necessary to kill in self-defense. The issue has recently been decided against defendant's position in *State v. Rose*, 335 N.C. 301; any theory of self-defense is strongly negated by the fact that the victim had been shot in the back of the head; and any error was not prejudicial because the jury rejected both voluntary manslaughter and second-degree

**STATE v. RUSH**

[340 N.C. 174 (1995)]

murder when it found defendant guilty of first-degree murder on the basis of premeditation and deliberation.

### · **Am Jur 2d, Homicide §§ 525 et seq.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Farmer, J., at the 2 November 1993 Criminal Session of Superior Court, Wake County, on a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 15 March 1995.

*Michael F. Easley, Attorney General, by Marilyn R. Mudge, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Janine M. Crawley, Assistant Appellate Defender, for defendant-appellant.*

WHICHARD, Justice.

Defendant was indicted for one count of first-degree murder, was tried noncapitally and found guilty, and was sentenced to life imprisonment. We find no prejudicial error.

At defendant's trial, the State presented evidence that tended to show the following:

Bryan Bobbitt testified that defendant and the victim, Timothy Strickland, were his neighbors. On 18 June 1993, Bobbitt's father hosted a neighborhood cookout, which defendant attended. Defendant and Bobbitt left the cookout around midnight and sat down on the road outside to finish their beers. About thirty minutes later, Strickland drove up in his car and joined them. Bobbitt testified that defendant and Strickland had a history of animosity; that night tension began to build between them. Bobbitt was too intoxicated to recall much of their conversation, but he remembered Strickland accusing defendant of always "hiding behind his gun or knife." Defendant usually carried a .38-caliber Derringer on his belt, and he had it with him that night. Defendant responded to Strickland's comment by handing his gun and pocketknife to Bobbitt. Defendant then stood up, retrieved the weapons from Bobbitt, and left for home.

According to Bobbitt, defendant returned in ten minutes. He was carrying a .9-millimeter semiautomatic pistol. He knelt in front of Strickland and pointed the gun at him. He stated, "Do you think this is a game, do you think I'm playing with you," and shot Strickland

once in the forehead. Defendant then went home to call the police. Bobbitt did not see Strickland grab or lunge at defendant.

On cross-examination Bobbitt testified that defendant was disabled as a result of a roofing accident. He had a limp and could not run. Strickland was twenty years younger than defendant, had studied martial arts, and had a reputation for being violent when drunk. Strickland was intoxicated the night of the murder. Bobbitt admitted that his memory of the night was impaired because he had been intoxicated.

Deputy Sheriff Katrina Seitz was working as a 911 dispatcher during the early morning of 19 June. She testified she received a call at 1:45 a.m. from defendant that she recorded. The trial court admitted the tape recording and a written transcript of the call; the tape was played to the jury. During the 911 conversation, defendant told Seitz he had shot someone. He gave his name and address and agreed to cooperate with police when they arrived.

Dr. Frank Avery, a pathologist, testified that the victim had one bullet wound to the back of his head and another to his left leg. The victim's blood alcohol level was .17. On cross-examination Dr. Avery stated that the wounds could have been caused by the same bullet if the victim had been sitting and was shot first in the head. He further stated that, contrary to Bobbitt's testimony, the victim could not have been facing defendant when he was shot.

Deputy Sheriff Walt Martin testified that he responded to the 911 call placed by defendant. When Martin arrived, he saw the victim in the road and defendant standing on his porch. Martin asked for the gun, and defendant stated that it was inside. Defendant gave Martin permission to retrieve the gun and the pocketknife from the kitchen table. Martin did so.

Deputy Sheriff Robert Bizell testified that he interviewed defendant on the porch the morning of the shooting. Defendant was calm and polite. He admitted shooting the victim. He invited the officers to search him for other weapons. A search revealed no weapons.

Deputy Sheriff Dennis Currin met defendant outside his house at 3:00 a.m. He directed defendant to take a seat in the patrol car, read him his *Miranda* rights, and took his statement. Defendant stated that he and Bobbitt had been sitting in front of defendant's house drinking beer when Strickland arrived. All three men smoked some marijuana. Defendant and Strickland had fought with one another

previously. On that night defendant perceived that another confrontation was beginning. Consequently, he went inside his house and retrieved his .9-millimeter gun. Defendant had a smaller pistol with him at the scene, but he went into the house to get his larger gun. He then went outside, walked up behind the victim, and shot him in the back of the head. He explained he just decided to end the hostile relationship he had with Strickland. Currin asked defendant if Strickland had a weapon, such as a stick, a knife, or a gun, and defendant responded that Strickland did not. Currin then asked him if Strickland had threatened him in any way, and defendant responded that Strickland told him "he would do him in." Currin further testified he arrested defendant, who had been drinking but was not intoxicated. He indicated that defendant was lucid. Currin testified from notes taken during his interview with defendant.

Defendant's evidence tended to show the following:

Defendant testified that Strickland had a history of harassing him and making fun of his disability. He teased defendant about his limited ability to care for his yard and about his status as a house husband. Strickland had threatened to kill defendant in the past, and they had had several violent encounters. On one occasion Strickland shoved defendant onto a coffee table in defendant's home. Strickland at another time tried to run defendant down with a dirtbike and knocked him into a ditch on the side of the road. Defendant was aware that Strickland had studied martial arts and knew that he had engaged in fights with others. Because of his enhanced vulnerability due to his handicap, defendant always carried a gun for protection.

Defendant described what happened the night of the murder. A group of neighbors gathered at Bobbitt's for a cookout in celebration of defendant's birthday. Defendant drank approximately six beers. Defendant left the party around midnight. Bobbitt, who was highly intoxicated, followed him and invited him to sit and drink; defendant agreed. Strickland joined them; he also had been drinking. According to defendant, Strickland was immediately hostile towards him and accused him of always hiding behind a gun or knife. Defendant testified that he handed these to Bobbitt to reduce the tension. He decided to return to his house after a minor dispute occurred over whether Strickland had any marijuana.

Defendant further testified he looked outside about twenty minutes later and saw Bobbitt and Strickland still sitting by the road. Defendant was worried that Bobbitt might pass out in the path of traf-

fic, so he went back outside. In addition to the Derringer defendant already had, he picked up his .9-millimeter gun as a matter of habit. He approached Bobbitt and Strickland and told Bobbitt to go in. Strickland responded by cursing defendant and telling him to mind his own business. Strickland then yelled, "I'm going to kill you, motherf———," and he grabbed defendant's lame leg. Defendant stepped back to keep his balance, pulled out his gun, and shot Strickland. He stated that Strickland looked crazy and he was afraid Strickland would kill him. On cross-examination defendant stated that when he picked up his .9-millimeter gun in the house, he also had his Derringer in his belt and his knife in his pocket.

Several witnesses testified that defendant was a peaceable person and that Strickland was violent and argumentative when drunk and was always looking for a fight.

[1] Defendant first assigns as error the admission into evidence of out-of-court statements made by his spouse, Nancy Rush, to a 911 dispatcher the night of the murder. The tape was introduced through Deputy Sheriff Seitz, who took the call. It was played for the jury, and copies of the transcript were distributed to each juror. Ms. Rush spoke with Seitz after Seitz directed defendant to wait outside the house for police. Defendant argues that the portion of the call containing Ms. Rush's statements to Seitz should have been redacted because it was inadmissible based on Ms. Rush's refusal to testify against her husband. Defendant cites two comments made by Ms. Rush. Soon after defendant left the house, Ms. Rush asked Seitz, "How can he do this?" A few minutes later, and before defendant's arrest, Ms. Rush asked whether she would be required to accompany her husband "downtown."

Defendant did not object to the admission of this evidence. He maintains, however, that this issue is preserved for appellate review because its introduction "is forbidden by statute in the furtherance of public policy." *See State v. Warren*, 236 N.C. 358, 359-60, 72 S.E.2d 763, 764 (1952); *see also State v. Ashe*, 314 N.C. 28, 39, 331 S.E.2d 652, 659 (1985) ("[W]hen a trial court acts contrary to a statutory mandate and a defendant is prejudiced thereby, the right to appeal the court's action is preserved, notwithstanding defendant's failure to object at trial."). Defendant bases his contention on N.C.G.S. § 8-57, which he interprets as prohibiting the admission of out-of-court statements made by a defendant's spouse and introduced against the defendant for the State through a third party. For the reasons given in our sub-

stantive discussion of this issue *infra,* we conclude that the evidence was not forbidden by the statute. Defendant therefore has failed to preserve his right to appellate review of this issue. Thus, this assignment of error is reviewable only under the plain error rule. *See State v. Black,* 308 N.C. 736, 741, 303 S.E.2d 804, 807 (1983) ("plain error" rule applies to evidentiary matters). In order to prevail under plain error analysis, defendant must first establish that the trial court committed error and then show that "absent the error, the jury probably would have reached a different result." *State v. Jordan,* 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993).

In *State v. Freeman,* 302 N.C. 591, 276 S.E.2d 450 (1981), we reexamined the common law rule that a defendant's spouse is incompetent to testify against the defendant in a criminal proceeding. We concluded that "the rule sweeps more broadly than its justification" because the defendant there employed it to thwart our justice system rather than to promote family harmony, which was the intended purpose of the common law rule. *Id.* at 595, 276 S.E.2d at 453. We therefore held that "[h]enceforth, spouses shall be incompetent to testify against one another in a criminal proceeding only if the substance of the testimony concerns a 'confidential communication' between the marriage partners made during the duration of their marriage." *Id.* at 596, 276 S.E.2d at 453; *see also State v. Holmes,* 330 N.C. 826, 835-36, 412 S.E.2d 660, 665 (1992) (holding that under N.C.G.S. § 8-57(c) a spouse may not voluntarily testify to confidential communications when the defendant spouse asserts the spousal privilege). We concluded that

> [t]his holding allows marriage partners to speak freely to each other in confidence without fear of being thereafter confronted with the confession in litigation. However, by confining the spousal disqualification to testimony involving "confidential communications" within the marriage, we prohibit the accused spouse from employing the common law rule solely to inhibit the administration of justice.

*Freeman,* 302 N.C. at 596, 276 S.E.2d at 453-54.

In response to our decision in *Freeman,* the legislature amended N.C.G.S. § 8-57(b), which at the time of *Freeman* provided: "Nothing herein shall render any spouse competent or compellable to give evidence against the other spouse in any criminal action or proceeding . . . ." 1967 N.C. Sess. Laws ch. 116, § 1. Section 8-57(b), in its amended form, provides in pertinent part:

(b) The spouse of the defendant shall be competent but not compellable to testify for the State against the defendant in any criminal action or grand jury proceedings . . . .

N.C.G.S. § 8-57(b) (1986). As amended, the statute embodies the common law rule, left undisturbed by *Freeman*, that a defendant's spouse may not be compelled to testify against a defendant for the State. By its declaration of the competency of the defendant's spouse, it also reflects our judicial abrogation in *Freeman* of the common law rule that a spouse is incompetent to testify against the defendant spouse when willing to do so.

The sole prohibition of N.C.G.S. § 8-57(b) is now directed to compelled testimony. The use of the word "testify" indicates that out-of-court statements made by a spouse and introduced through a third party are not within the purview of the statute. To "testify" means "to make a solemn declaration, under oath or affirmation, in a judicial inquiry, for the purpose of establishing or proving some fact." *Black's Law Dictionary* 1476 (6th ed. 1990). This section of the statute therefore does not address out-of-court statements made by a spouse and introduced against a defendant spouse for the State through a third party. We also note that N.C.G.S. § 8-57(c) is inapplicable here because defendant in his brief concedes that the statements at issue were not confidential. *See* N.C.G.S. § 8-57(c) ("No husband or wife shall be compellable in any event to disclose any confidential communication made by one to the other during their marriage."). Our determination of this issue therefore is based on that part of the common law not covered by the statute. *See Freeman*, 302 N.C. at 594, 276 S.E.2d at 452 (except as modified by N.C.G.S. § 8-57, common law rule on competency of spouses to testify against each other remains in effect); *see also State v. Josey*, 328 N.C. 697, 704, 403 S.E.2d 479, 483 (1991) (discussing applicability of N.C.G.S. § 8-57 to issue of admissibility of confidential spousal communications through spousal testimony).

Since our judicial abrogation in *Freeman* of the common law rule of incompetence, we have not addressed the issue of whether a spouse's out-of-court statements may be introduced against a defendant spouse for the State. In cases decided prior to *Freeman*, we held that a spouse's out-of-court statements are inadmissible against the defendant spouse for the State. *See, e.g., State v. Dillahunt*, 244 N.C. 524, 525, 94 S.E.2d 479, 479-80 (1956) (holding inadmissible, because incompetent, an incriminating statement made by defendant's spouse

to sheriff); *State v. Warren,* 236 N.C. 358, 360, 72 S.E.2d 763, 764 (1952) (holding inadmissible, because incompetent, an incriminating statement made by defendant's spouse to a police officer whose testimony included the statement). Our decisions in those cases were based on the rationale that the statements were incompetent. In light of the principles enunciated in *Freeman,* that rationale no longer applies.

As we indicated in *Freeman,* we left intact the common law prohibition against disclosure of confidential marital communications in order to allow "marriage partners to speak freely to each other in confidence without fear of being thereafter confronted with the confession in litigation." *Freeman,* 302 N.C. at 596, 276 S.E.2d at 453-54. By so limiting the privilege, we sought to prevent the defendant spouse from using the rule to thwart the administration of justice. Here, the same principle applies. Allowing the admission of nonconfidential, out-of-court statements made by a spouse and introduced against the defendant spouse for the State through a third party promotes the administration of justice without infringing on the confidence of the marital relationship. *See* 1 Brandis & Broun, *North Carolina Evidence* § 135 at 468 (4th ed. 1993) ("[Post-*Freeman*] extrajudicial statements would seem to be admissible, when relevant, when offered for a nonhearsay purpose or under an exception to the hearsay rule, unless involving a matter privileged as a confidential communication."). Further, no compulsion occurs when the statements are introduced through a third party. We therefore hold that the spousal privilege does not bar nonconfidential, out-of-court statements made by a spouse and introduced against a defendant spouse for the State through a third party.

[2]   Because these out-of-court statements by Ms. Rush were not barred by N.C.G.S. § 8-57 or the common law governing spousal privilege, we must determine whether they were relevant and offered either for a nonhearsay purpose or under an exception to the hearsay rule. Defendant maintains that the statements were irrelevant. He further contends that Ms. Rush's questioning of her husband's actions and her presumption that he would be arrested implied that she did not believe her husband had acted in justifiable self-defense. Therefore, according to defendant, the admission of the evidence was prejudicial.

Assuming *arguendo* that these unobjected-to statements were irrelevant, and that on that basis it was error to admit them, we can-

not say that absent these comments the jury probably would have reached a different result. The evidence establishing premeditation and deliberation was overwhelming. In defendant's statements to Seitz and to Currin immediately after the shooting, defendant admitted shooting Strickland. He indicated to Currin that he had gone into his house to retrieve a gun larger than the one he already had with him and that he shot Strickland in the back of the head because he wanted to end their hostile relationship. Further, the pathologist testified that Strickland was shot in the back of the head. This physical evidence comported with defendant's account of the shooting given at the scene and contradicted his claim of self-defense at trial. We therefore conclude that it is improbable that Ms. Rush's comments to the 911 dispatcher affected the jury's verdict. Thus, the admission of these statements was not plain error.

[3] In this assignment of error defendant also argues that the court erred by allowing the prosecutor to ask defendant on cross-examination about a pretrial statement made by Ms. Rush to police. During the prosecutor's cross-examination of defendant, the prosecutor asked defendant whether he heard his spouse screaming to him as he left the house just prior to the shooting. Defendant objected, and the objection was sustained. The prosecutor requested a hearing outside the presence of the jury. A voir dire was held during which the following exchange occurred between the prosecutor and defendant:

Prosecutor: Sir, when you went out the door of your house, your wife screamed at you, "Do not do this. Think about your son," didn't she?

Defendant: No, sir.

Prosecutor: Are you denying that you heard, that you—you say she did not make the statement?

Defendant: I didn't hear her make it.

The trial court ruled that the prosecutor could pursue this line of inquiry before the jury. Defendant excepted on the grounds that the spouse's statement could not be compelled as evidence against defendant, and moved for a mistrial. The court denied the motion, and the same exchange between the prosecutor and defendant occurred before the jury.

Defendant argues that the prosecutor should have been prohibited from asking about this out-of-court statement made by Ms. Rush

on the basis that the statement was within the spousal privilege. As discussed above, the statement was competent and nonconfidential and therefore proper for inquiry by the prosecutor if relevant and either nonhearsay or admissible under a hearsay exception. Defendant further argues, however, that the statement was an improper basis for cross-examination because the prosecutor was on notice that Ms. Rush's statement was not within the knowledge of the defendant, who during voir dire had denied that he heard it. In addition, at the time the question was posed the prosecutor knew the remark had no impeachment value because defendant indicated he did not hear it. Defendant also contends the statement was highly prejudicial because Ms. Rush's admonition to defendant prior to the shooting was the State's strongest evidence that defendant acted with premeditation and deliberation.

Assuming *arguendo* that the question posed by the prosecutor was improper because the prosecutor knew from voir dire that defendant had not heard the statement, we conclude that the error was not prejudicial. The assumed error does not implicate a right arising under the federal or state Constitution; therefore, the test is whether there is a reasonable possibility that had the error not occurred, the jury would have reached a different result. N.C.G.S. § 15A-1443(a) (1988); *State v. Lee*, 335 N.C. 244, 273, 439 S.E.2d 547, 561, *cert. denied*, — U.S. —, 130 L. Ed. 2d 162 (1994). Defendant has the burden of showing that such a reasonable possibility exists. N.C.G.S. § 15A-1443(a); *State v. Gibson*, 333 N.C. 29, 44, 424 S.E.2d 95, 104 (1992), *overruled on other grounds by State v. Lynch*, 334 N.C. 402, 432 S.E.2d 349 (1993). Defendant has failed to carry that burden. Defendant's characterization of this statement as the State's strongest evidence of premeditation and deliberation is considerably exaggerated. There was plenary other evidence of premeditation and deliberation, as discussed above.

We conclude that there is not a reasonable possibility that this single question, to which defendant gave a negative response, impacted the jury's verdict. This assignment of error is overruled.

[4] Defendant next assigns as error the trial court's overruling of defendant's objections to questions posed by the prosecutor during his cross-examination of defendant. He contends that the trial court's failure to give any curative instruction to the jury or to declare a mistrial resulted in prejudicial error requiring a new trial.

During cross-examination of defendant, the following exchange occurred:

> Prosecutor: And you've been sitting around for the last two months fabricating this story about going out there to help Bryan Bobbitt out of the street and all this other stuff that you've told us today, because you knew what was going to happen to you if you stuck to the story you told this detective, didn't you?

> Defendant: No, sir. I told [my attorney] about it long before that.

>     . . . .

> Prosecutor: When did you fabricate this story, sir?

Defense counsel then objected and was overruled. The prosecutor withdrew the question.

Defendant concedes that the first question was arguably acceptable as an attempt by the prosecutor to expose a fabricated defense. He argues, however, that the second question was a thinly disguised expression of the prosecutor's personal opinion about defendant's lack of veracity because defendant's response to the first question was negative. The prosecutor withdrew the second question, thereby indicating that he knew it to be improper. We disagree with defendant's characterization of the questioning.

Defendant's trial testimony differed from his prior accounts of the shooting to Currin and Seitz. In neither of those accounts did defendant offer a self-defense explanation. At trial defendant's account suggested that the victim grabbed his leg and threatened to kill him. The prosecutor consequently sought to attack defendant's credibility through defendant's inability to reconcile his testimony with his earlier statements. His first question to defendant was a proper attempt on cross-examination to expose a fabricated defense. *See State v. Mitchell,* 317 N.C. 661, 667-68, 346 S.E.2d 458, 462 (1986) (no error in prosecutor's question to defendant, "Took you awhile to dream all that stuff up, too, didn't it?" because it was an attempt to expose a fabricated defense); *see also State v. Alston,* 294 N.C. 577, 586, 243 S.E.2d 354, 361 (1978) (prosecutor's cross-examination of defendant not prejudicial error where defendant had given two completely different statements under oath).

The prosecutor's second question, regarding when the fabrication occurred, was precipitated by defendant's testimony that he told his story to his attorney more than two months before the trial. This

exchange was simply a vigorous cross-examination properly designed to discredit defendant's belated self-defense theory. Counsel is given wide latitude and has the right and duty to cross-examine vigorously a defendant who takes the stand in his own defense. "A [prosecutor] may ask a defendant . . . questions tending to discredit [his] testimony, no matter how disparaging the question may be." *State v. Daye*, 281 N.C. 592, 596, 189 S.E.2d 481, 483 (1972). This assignment of error is overruled.

[5]  Defendant next assigns as error the trial court's instructions on self-defense. Defendant failed to object to the instructions. They therefore are subject to plain error review. *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983).

The court instructed the jury on possible verdicts of guilty of first-degree murder, second-degree murder, or voluntary manslaughter and of not guilty. Defendant argues that the self-defense instructions incorrectly allowed a verdict of guilty of voluntary manslaughter based on a defense of imperfect self-defense only if defendant reasonably believed it was necessary to kill in self-defense. We recently decided this issue against defendant's position in *State v. Rose*, 335 N.C. 301, 330-31, 439 S.E.2d 518, 534, *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 883 (1994), and *State v. Watson*, 338 N.C. 168, 179-81, 449 S.E.2d 694, 702-03 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 569 (1995). We decline to reconsider our position. We also note that the fact that the victim had been shot in the back of the head, and thus could not have been facing defendant when he was shot, strongly negates any theory of self-defense.

Finally, any alleged error in the instructions was not prejudicial because the jury rejected both voluntary manslaughter and second-degree murder when it found defendant guilty of first-degree murder on the basis of premeditation and deliberation. By so doing, the jury necessarily rejected the theory of an unintentional killing. *See State v. Hardison*, 326 N.C. 646, 654-55, 392 S.E.2d 364, 369 (1990) (if failing to instruct on voluntary manslaughter was error, harmless because jury was properly instructed on second-degree murder and found defendant guilty of first-degree murder based on premeditation and deliberation). This assignment of error is overruled.

We conclude that defendant received a fair trial, free from prejudicial error.

NO ERROR.