STATE OF NORTH CAROLINA v. WILLIAM LEE SCOTT

No. 261A94

(Filed 13 JUNE 1996)

1. **Judges, Justices, and Magistrates § 27 (NCI4th)— noncapital first-degree murder—motion to recuse denied—no error**

The trial court did not err in a first-degree murder prosecution by not recusing himself or by failing to have the recusal motion heard by another judge where defendant alleged that the judge had publicly expressed a strong opinion about the victim's credibility and defendant's relationship with her, had presided over criminal proceedings in which defendant was being tried, and had a son who was a prosecutor in that county. Defendant did not present substantial evidence that there was an appearance of partiality by the judge, and, since there were no facts presented to cause a reasonable person to doubt the judge's partiality, there was no error in the failure to refer the motion to another judge. N.C.G.S. § 15A-1223.

**Am Jur 2d, Judges §§ 86 et seq.**

**Disqualification of judge on ground of being a witness in the case. 22 ALR3d 1198.**

**Disqualification of judge by state, in criminal case, for bias or prejudice. 68 ALR3d 509.**

**Prior representation or activity as prosecuting attorney as disqualifying judge from sitting or acting in criminal case. 16 ALR4th 550.**

2. **Searches and Seizures § 28 (NCI4th)— noncapital first-degree murder—warrantless search of residence—motion to suppress denied**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to suppress evidence found in the crawl space under his home, in a subsequent search inside his home, and his statement to police where an officer was on defendant's premises investigating a missing person report; the initial responding officer knocked on the front door; after he received no response he noticed green flies and went to the rear of the house, where he again noticed green flies, this time accom-

STATE v. SCOTT

[343 N.C. 313 (1996)]

panied by the smell of rotting flesh; he leaned into the crawl space under the house from which the flies and odor emanated and found the victim's body; he secured the scene and called for assistance; investigators arrived and conducted a protective sweep of the house which could have revealed additional victims or hiding suspects; and officers found defendant inside the residence, but did not conduct a more complete search until a warrant was obtained. Viewing the scene through the eyes of a reasonable and cautious police officer on the scene, guided by this officer's experience and training, the search of the crawl space was not unreasonable. Once the officer found the body under the house, he was confronted with a potential emergency and had reason to believe that an injured person might be in the house or that the perpetrator was in the house. The subsequent search of the house was reasonable and the statements of defendant were not taken as a result of any illegal search.

**Am Jur 2d, Searches and Seizures § 140.**

3. **Evidence and Witnesses §§ 339, 2750.1 (NCI4th)— noncapital first-degree murder—abusive relationship—admissible**

The trial court did not err in a first-degree murder prosecution by admitting evidence of the victim's physical injuries and appearance at various times between 1978 and 1993. Testimony about defendant's frequent arguments with, violent acts toward, separations from, reconciliations with, and threats to the victim was admissible under N.C.G.S. § 8C-1, Rule 404(b) to prove issues he disputed, such as lack of intent, malice, premeditation, and deliberation, notwithstanding that some of the incidents dated back some years. Further, defendant opened the door by stating that he and the victim had a loving relationship.

**Am Jur 2d, Evidence § 439; Homicide § 310; Witnesses §§ 717, 718.**

4. **Appeal and Error § 147 (NCI4th)— noncapital first-degree murder—admissibility of medical records—no objection at trial—plain error not alleged**

The question of whether the trial court erred in a first-degree murder prosecution by allowing the director of medical records at a hospital to testify about recorded statements made by the victim to physicians and nurses was not preserved for appeal since defendant did not object at trial or allege plain error.

**Am Jur 2d, Appellate Review §§ 614 et seq.**

STATE v. SCOTT

[343 N.C. 313 (1996)]

Sufficiency in federal court of motion in limine to preserve for appeal objection to evidence absent contemporary objection at trial. 76 ALR Fed. 619.

5. Evidence and Witnesses § 1946 (NCI4th)— noncapital first-degree murder—records of home for abused women—business records exception

The trial court did not err in a first-degree murder prosecution by admitting an intake form from a home for abused women and children which had been completed by the victim at the request of and in the presence of the director of the home, who testified that the form is filled out in the regular course of business at the shelter and is used by counselors when working with residents. Since the record was completed by the victim, a person with knowledge, at or near the time she entered the shelter, the trial court did not err in admitting the form under N.C.G.S. § 8C-1, Rule 803(6) as a business record made in the ordinary course of business.

Am Jur 2d, Evidence §§ 1290-1300, 1304, 1307, 1309, 1311, 1312, 1319.

Letters to or from customers or suppliers as business records under statutes authorizing reception of business records in evidence. 68 ALR3d 1069.

Business records: authentication and verification of bills and invoices under Rule 803(6) of the Uniform Rules of Evidence. 1 ALR4th 316.

Admissibility of computerized private business records. 7 ALR4th 8.

6. Evidence and Witnesses § 959 (NCI4th)— noncapital first-degree murder—statements by victim—fear of defendant—state of mind exception

The trial court did not err in a first-degree murder prosecution by admitting hearsay statements by the victim that defendant had caused her injuries in the past, that she often hid from defendant, and that she was afraid of defendant. The conversations between the victim and the nine witnesses related directly to the victim's fear of defendant and were properly admitted pursuant to the state of mind exception to the hearsay rule to show the nature of the victim's relationship with defendant.

Am Jur 2d, Evidence §§ 666, 667.

**7. Evidence and Witnesses § 761 (NCI4th)— noncapital first-degree murder—prior threat to shoot police officers—admissible**

There was no prejudicial error in a first-degree murder prosecution in the admission of evidence that defendant had threatened to shoot police officers in 1990 where similar evidence was admitted without objection several other times in the trial.

**Am Jur 2d, Appellate Review §§ 753, 759.**

**8. Evidence and Witnesses § 770 (NCI4th)— noncapital first-degree murder—hearsay—corroborative—limiting instruction**

There was no prejudicial error in a first-degree murder prosecution in the admission of testimony from the victim's daughter that her half-brother had told her that he thought defendant had burned some important papers where the trial judge instructed the jurors that they should consider the testimony if they found it corroborative of the half-brother's testimony, but to otherwise disregard it. The limiting instruction made any error nonprejudicial.

**Am Jur 2d, Appellate Review §§ 713, 752, 753, 759.**

**9. Evidence and Witnesses § 292 (NCI4th)— noncapital first-degree murder—cross-examination of witness—defendant's substance abuse**

The trial court did not err in a first-degree murder prosecution by allowing the prosecutor to elicit on cross-examination "other crimes" evidence that defendant had a substance abuse problem. The question elicited only whether defendant had a substance abuse problem and defendant did not object to the specific response that the witness and defendant smoked marijuana. Additionally, the witness testified on direct examination that smoking and drinking wasn't part of defendant's lifestyle until recent years; the trial court did not err by overruling defendant's objection to the cross-examination on the basis that the subject was brought up on cross.

**Am Jur 2d, Evidence § 331.**

10. **Evidence and Witnesses § 2750.1 (NCI4th)— noncapital first-degree murder—defense witness—cross-examination—in jail during conversation—door opened on direct**

The trial court in a first-degree murder prosecution did not erroneously allow the prosecutor to impeach a defense witness with evidence that he was in jail when the victim told him that she wanted to die where the defendant opened the door by asking about the witness's request that the victim bring paper and writing instruments to him. A question arose naturally and logically as to why she needed to bring him those items and evidence of the circumstances behind the request was admissible to provide a complete picture for the jury.

**Am Jur 2d, Witnesses § 417.**

11. **Evidence and Witnesses § 2797 (NCI4th)— noncapital first-degree murder—prosecutor's cross-examination of defendant—not improper**

There was no prejudicial error in a first-degree murder prosecution in allowing the prosecutor to conduct what defendant contended was an improper, insulting, and impertinent cross-examination of him that did not elicit relevant evidence. The prosecutor did not place before the jury his own opinions or inadmissible evidence, and there is nothing to show that the testimony was elicited in bad faith or that the questioning exceeded the scope of permissible cross-examination.

**Am Jur 2d, Witnesses §§ 426 et seq.**

12. **Homicide 244 (NCI4th)— noncapital first-degree murder—premeditation and deliberation—sufficiency of evidence**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to dismiss for insufficient evidence of premeditation and deliberation where the evidence tended to show that defendant and the victim had a hostile relationship; there was no evidence that the victim struggled or provoked defendant; defendant lied to everyone about the victim's whereabouts and did not call the police or emergency medical personnel; defendant hid the victim's body under his residence; the victim was shot at close range by a shotgun; and the medical examiner testified that it was highly improbable that defendant's claim that the victim committed suicide was accurate.

**Am Jur 2d, Homicide §§ 437 et seq.**

### 13. Homicide § 113 (NCI4th)— noncapital first-degree murder—voluntary intoxication—failure to instruct

The trial court did not err by failing to instruct on voluntary intoxication as a defense to first-degree murder where the evidence shows that defendant may have been highly intoxicated but does not show that defendant was utterly incapable of forming a deliberate and premeditated purpose to kill.

**Am Jur 2d, Homicide §§ 128, 129.**

### 14. Criminal Law § 468 (NCI4th)— noncapital first-degree murder—prosecutor's closing arguments—not grossly improper

The trial court did not err by failing to intervene *ex mero motu* and instruct the jury to disregard several statements made by the prosecutor during closing arguments. When read in context, the prosecutor's argument was no more than an argument that the jury should consider defendant's credibility since he had lied about the victim's whereabouts before her body was found. Although the prosecutor mixed up two assaults on the victim, the mix-up was slight and the error could not possibly have been prejudicial to defendant. Finally, as for the argument that defendant had threatened the victim, there was testimony that defendant said he was going to kill her if she proceeded with charges. The prosecutor's argument was not so grossly improper as to require the trial judge to intervene *ex mero motu*.

**Am Jur 2d, Trial §§ 533-704.**

### 15. Homicide § 709 (NCI4th)— noncapital first-degree murder—no instruction on involuntary manslaughter—verdict of guilty of first-degree murder—no error

There was no prejudicial error in a first-degree murder prosecution where the court did not instruct the jury on involuntary manslaughter but the jury was properly instructed on first-and second-degree murder and returned a verdict of guilty of first-degree murder.

**Am Jur 2d, Homicide §§ 528, 531, 558.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Allen (J.B., Jr.), J., at the 21 March 1994 Mixed Session of Superior Court,

## STATE v. SCOTT

[343 N.C. 313 (1996)]

Alamance County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 15 February 1996.

*Michael F. Easley, Attorney General, by William B. Crumpler, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant-appellant.*

FRYE, Justice.

On 26 July 1993, an Alamance County grand jury indicted defendant, William Lee Scott, for the murder of Nancy Funderburke. A superseding indictment for this crime was returned on 7 March 1994. In a noncapital trial, the jury found defendant guilty of first-degree murder on the basis of premeditation and deliberation. On 5 April 1994, the trial court entered a judgment imposing a sentence of life imprisonment for the first-degree murder conviction.

On appeal to this Court, defendant makes thirteen arguments. After reviewing the record, transcript, briefs, and oral arguments of counsel, we conclude that defendant received a fair trial, free of prejudicial error.

The State's evidence presented at trial tended to show the following facts and circumstances: In 1969, defendant met the victim, Nancy Funderburke, in Savannah, Georgia. Defendant was a singer in a night club where Funderburke waited tables. At that time, Funderburke had two young daughters, Gina and Stacy. Funderburke, then a widow, had been married twice.

In 1972, after dating for a while, defendant moved in with Funderburke and her daughters. They lived in Charlotte, North Carolina, until 1976, when they moved to Saxapahaw, North Carolina. Funderburke and defendant had a son, William Lee Scott, Jr. (Billy), born 8 July 1977. In 1984, after defendant's mother died, they moved to Burlington, North Carolina, to live in defendant's mother's home. Except for a few brief separations, Funderburke and defendant continued to live together for twenty-one years until Funderburke's death. Although Funderburke often referred to defendant as her husband, they were never married.

There were numerous documented occasions of physical abuse of Funderburke by defendant. The police had been to the house on several occasions for complaints about loud music and for domestic

violence. Funderburke's daughters and Billy witnessed the violence, and several hospital officials and friends saw evidence of the abuse. There was also evidence that Funderburke and defendant often drank excessively and that, during these times, they engaged in fights. Funderburke often left the residence during or after these altercations and stayed at a hotel or slept in her car. Sometimes, Funderburke and Billy would leave and stay at a family abuse shelter. Once, Billy threatened to kill defendant if defendant hurt his mother again.

On Friday, 2 July 1993, Billy, who was then fifteen years old, went to the beach with some friends for the weekend. At around 9:30 or 10:00 p.m. on 5 July 1993, Billy returned home and asked defendant where was his mother. Defendant, who was very intoxicated, mumbled that she had gone to the Ramada Inn or something. Defendant also mumbled something about being sorry about taking a life.

Billy noticed that his mother's bar stool was in the backyard. Defendant told Billy that he had placed the bar stool in the backyard to clean it because some beer had spilled on the bar stool. Defendant said that he was sorry for the things that he had done to Funderburke but did not say where she was at the time.

The next morning, Billy called his sister, Gina Anderson, and expressed his concern about their mother. He told Anderson that the floor had been freshly mopped, which he considered unusual. Billy stated that he had been directed not to call his sisters and that he believed his mother was dead. Anderson said she would call the police. After talking to Anderson, Billy visited a friend's house to see if he could stay there. Anderson contacted her sister, Stacy Strader, and then contacted the police and reported her mother missing. Later that night, the police contacted Billy, and he went to the police station.

On 6 July 1993 at approximately 7:30 p.m., Sergeant Bobby Davis of the Burlington Police Department went to defendant's residence to investigate the missing person's report filed by Anderson. Two vehicles were in the driveway, but when Davis knocked on the front door, no one answered. While knocking on the door, Davis noticed large green flies flying under the house through an air vent. He had previously seen these types of flies on dead animals and people. He then proceeded to the rear of the house, where he noticed the flies at the access door to the underside of the house and could smell an odor of

decaying flesh. He then noticed that there was a green carpet against the access door going underneath the house.

When Davis moved the carpet, he observed that the grass under it was green, which indicated that the carpet had been placed there recently. He opened the access door to the crawl space and shined his flashlight under the house. At this point, he saw the body of a female about midway under the house. After securing the scene, he notified the detective division.

Additional officers arrived on the scene. The officers did not know whether defendant or other victims were inside the house injured or dead. After knocking on the door and yelling for someone to answer, they decided to enter the residence to see if anyone else was injured inside as well as to ensure their own safety. When the officers forced open the door, they found defendant in the living room. Defendant walked over to a bar stool, sat down, and said, "Come on in."

Defendant was handcuffed and led to a patrol car. Officers quickly walked through the residence to check for additional victims. After no more victims were found in the residence, officers removed the handcuffs from defendant's wrists and advised him that he was not under arrest and that he could voluntarily come to the police station. An officer told defendant that they were investigating a missing person's report regarding Funderburke and that they had found a body under his residence. Defendant was cooperative and agreed to talk with the police. Defendant rode with an officer to the police station, where he was questioned and released.

After a search warrant arrived at 2:30 a.m. on 7 July 1993, the police retrieved Funderburke's body from underneath the house. An autopsy revealed that she had suffered a shotgun wound to the chest and that this wound quickly caused her death. The gun was pointed straight at her, and her left hand was positioned between her chest and the muzzle of the gun when the gun was fired. In the medical examiner's opinion, Funderburke's wound could not have been self-inflicted, and the gun could have been within twelve inches of Funderburke's chest when fired.

A search of the house, including chemical testing for blood, revealed evidence of blood in several places. Also, evidence of wipe marks, consistent with someone attempting to clean up a mess, were found. A disassembled twelve-gauge shotgun, two boxes of shotgun

shells, and a loose shell were found in a speaker in Billy's bedroom. A fired shotgun shell was found in the shed outside the residence. The shotgun shells found in the house and shed were all the same kind and were consistent with the deformed pellets removed from Funderburke's body. Tests performed on the shotgun revealed that it would not fire accidentally, even if dropped.

Defendant testified at trial. He stated that he and Funderburke spent 2 July 1993 getting drunk. She was very depressed and talked about suicide. He went to the bathroom, and when he returned, she was attempting to position the shotgun so that she could shoot herself in the head. He began to struggle with her, and the shotgun went off, killing her instantly. Defendant did not know what to do, but he did not want to call the police because he and Funderburke had a lot of trouble with the police. Defendant also presented testimony that he and Funderburke had agreed that, when the other died, the survivor would not spend any money for a burial or funeral but instead would bury the other on defendant's property. Defendant testified that he decided to wait until Billy returned home to bury Funderburke. He stated that he wanted Billy to have an opportunity to see and touch his mother one more time.

Defendant further testified that, if Funderburke had been alive, he would have taken her to the hospital. However, since she was dead, he did not see the harm in letting her remain on the bar stool. For the rest of the evening, he sat beside her and drank. On the next day, he went to see his sister because he was feeling depressed. When asked about Funderburke's whereabouts, defendant said that he did not know and that she had probably gone to the Ramada Inn or something.

On the evening of 4 July 1993, defendant cleaned the house because he was concerned that his aunt would visit him. He took Funderburke's body off the bar stool and put it in another room because he did not want anyone to see her before Billy had a chance to see her. Bruce Bunting visited defendant, and they talked. That night, the body started to smell rotten.

On the evening of 5 July 1993, defendant placed Funderburke's body in the crawl space underneath the house and waited for Billy to come home. Defendant testified that he placed the body under a hole in the floor so he could see her. Billy arrived home at about 10:30 p.m. that night. Defendant testified that he (defendant) was intoxicated. When Billy asked for his mother, defendant said that she had gone to

the Ramada Inn or something. According to defendant, he then told Billy that his mother was dead and asked Billy if he wanted to see her. Defendant told Billy that he (defendant) was going to work in the morning and that Billy could do what he wanted about the body.

Defendant further testified that the police arrived at 7:30 p.m. on 6 July 1993, after defendant had returned from work. When the officers knocked, defendant figured that they were there investigating a missing person's report. Defendant testified that he did not answer the telephone or the door because he knew that "all hell would break loose" and that sooner or later they would find Funderburke's body. Defendant also testified that he heard the officers find the body and break down the front door of the house. He further stated that he told them to come in and that he allowed himself to be handcuffed and led away. He remembered being told that he was not under arrest and being asked if he wanted to come down to the police station. Defendant cooperated with the police.

Defendant's motions to dismiss made at the close of the State's evidence and again at the close of all the evidence were denied.

[1] In his first argument, defendant contends he is entitled to a new trial because his motion requesting that the trial judge recuse himself from defendant's trial was improperly denied. Defendant also argues that the trial judge erred in failing to have the recusal motion heard by another judge. We disagree.

At a pretrial hearing on 8 March 1994, defendant, alleging that he and Judge J.B. Allen, Jr., had been friends, requested that Judge Allen recuse himself. Judge Allen denied the motion. On 11 March 1994, defendant filed a written motion moving that Judge Allen be recused. Defendant alleged, among other things, that Judge Allen had publicly expressed a strong opinion about Funderburke's credibility and defendant's relationship with Funderburke, had presided over criminal proceedings in which defendant was being tried, and had a son who was a prosecutor in Alamance County.

On 21 March 1994, Judge Allen heard the motion. Defendant called as a witness Bradley Reid Allen, Judge Allen's son, who testified that, while he was an assistant district attorney in Alamance County, he lived with Judge Allen for a period of time after he began working in the district attorney's office; that he sometimes discussed criminal cases with Judge Allen after their disposition; that he had prosecuted defendant for DWI in 1991 and that the case had been dis-

missed; that he had prosecuted defendant later for DWI and driving while his license was revoked and that he had obtained a conviction on these charges; that he had limited contact with the instant case; and that he had not discussed the case with Judge Allen, and Judge Allen had not discussed the case with him.

As evidence of Judge Allen's alleged bias, defendant also presented a trial transcript from an assault trial over which Judge Allen presided. During the trial, in which defendant was accused of assaulting Funderburke, Funderburke testified that defendant did not assault her in 1991, that she had appeared before Judge Allen in 1979 and 1980 after swearing out warrants against defendant in which she alleged assault but had dropped the charges, and that she wished to drop the charges on that day. The following exchange took place between Judge Allen and Funderburke at the prior assault trial:

> COURT: Mrs. Funderburke, have you ever heard of the story about the little boy hollering wolf?
>
> A: Yes, sir.
>
> COURT: You're familiar with that?
>
> A: Ever since I was a child, yes, sir.
>
> COURT: Okay. Maybe you ought to reread that story. It has a big message behind it. You're free to go, ma'am.

After defendant presented this evidence during the recusal hearing and rested, and after the State declined to present evidence, Judge Allen stated, "[B]efore we go forward I want to put this on the record. . . . I, J.B. Allen, Jr., this presiding judge, has [sic] never discussed in any way the case of *State v. William Lee Scott* with either Bradley R. Allen, assistant DA[,] or Jeffrey B. Allen with the probation department. Now, I'll hear you on your argument, counsel." Defense counsel then argued:

> This Court has in open court expressed an opinion about the believability of Nancy Funderburke in a prior hearing in July of 1991. We would contend to the Court that a reasonable person looking at all the circumstances could conclude that there is an appearance of impropriety here in Your Honor having to make decisions concerning the reliability of out of court statements of Nancy Funderburke when at an earlier time you . . . in essence stated an opinion about the reliability of Nancy Funderburke's statements in a Superior Court proceeding. We, therefore, suggest

to the Court that it would be more proper for another judge to hear this matter that had no involvement with Funderburke and had no situation in which the Court was in the position of judging the credibility of Funderburke at a previous time.

After entertaining the State's arguments, Judge Allen dictated an oral order making findings of fact and concluding as a matter of law that he could be completely fair and impartial. Accordingly, Judge Allen denied defendant's motion for recusal.

Both N.C.G.S. § 15A-1223 and Canon 3 of the Code of Judicial Conduct control the disqualification of a judge presiding over a criminal trial when partiality is claimed. *State v. Fie*, 320 N.C. 626, 627, 359 S.E.2d 774, 775 (1987). N.C.G.S. § 15A-1223 provides, in pertinent part:

(b) A judge, on motion of the State or the defendant, must disqualify himself from presiding over a criminal trial or other criminal proceeding if he is:

(1) [p]rejudiced against the moving party or in favor of the adverse party . . . .

N.C.G.S. § 15A-1223 (1988).

The Code of Judicial Conduct provides in pertinent part:

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

(a) [h]e has a personal bias or prejudice concerning a party . . . .

Code of Judicial Conduct, Canon 3(C)(1)(a) (1993).

When a defendant makes a motion that a judge be recused, " 'the burden is upon the party moving for disqualification to demonstrate objectively that grounds for disqualification actually exist. Such a showing must consist of substantial evidence that there exists such a personal bias, prejudice or interest on the part of the judge that he would be unable to rule impartially.' " *Fie*, 320 N.C. at 627, 359 S.E.2d at 775 (quoting *State v. Fie*, 80 N.C. App. 577, 584, 343 S.E.2d 248, 254 (1986) (Martin, J., concurring)). The bias, prejudice, or interest which requires a trial judge to be recused from a trial has reference to the personal disposition or mental attitude of the trial judge, either favorable or unfavorable, toward a party to the action before him. *State v.*

*Kennedy,* 110 N.C. App. 302, 305, 429 S.E.2d 449, 451 (1993). A trial judge should either disqualify himself or refer the matter to another judge if there is " 'sufficient force in the allegations contained in defendant's motion to proceed to find facts.' " *State v. Poole,* 305 N.C. 308, 320, 289 S.E.2d 335, 343 (1982) (quoting *N.C. Nat'l Bank v. Gillespie,* 291 N.C. 303, 311, 230 S.E.2d 375, 380 (1976)).

After carefully reviewing the record and defendant's basis for his recusal motion in the instant case, we conclude that defendant has not presented substantial evidence of partiality or evidence that there was an appearance of partiality on the part of Judge Allen. Since there were no facts presented to cause a reasonable person to doubt Judge Allen's impartiality, there is no error in Judge Allen's failure to refer the motion to recuse to another judge. *See State v. Crabtree,* 66 N.C. App. 662, 665-66, 312 S.E.2d 219, 221 (1984) (where facts not shown to cause reasonable person to doubt impartiality, not error to fail to hold hearing on motion to recuse or to fail to refer motion to recuse to another judge). Thus, Judge Allen did not err in denying defendant's motion that he disqualify himself or in failing to refer the motion to recuse to another judge. Accordingly, we reject defendant's first argument.

[2] In his second argument, defendant contends that the trial court erred by denying his motion to suppress the evidence found when officers searched the crawl space underneath his home and when they subsequently searched inside his home. Defendant argues that the trial court erroneously denied his motion to suppress evidence of Funderburke's body, physical objects and materials found in the house, and his statement made to police on 6 July 1993.

Defendant argues that the warrantless search in the crawl space under his home violated his rights under the Fourth Amendment to the United States Constitution and Article I, Section 20 of the North Carolina Constitution. The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is applicable to the states through the Due Process Clause of the Fourteenth Amendment." *State v. Watkins,* 337 N.C. 437, 441, 446 S.E.2d 67, 69 (1994). Similarly, the Constitution of the State of North Carolina provides that "[g]eneral warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particu-

larly described and supported by evidence, are dangerous to liberty and shall not be granted." N.C. Const. art. I, § 20. The test for determining the reasonableness of the search under the Fourth and Fourteenth Amendments to the United States Constitution

"is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."

*State v. Primes*, 314 N.C. 202, 211, 333 S.E.2d 278, 283 (1985) (quoting *Bell v. Wolfish*, 441 U.S. 520, 559, 60 L. Ed. 2d 447, 481 (1979)).

This Court has stated that "a governmental search and seizure of private property unaccompanied by prior judicial approval in the form of a warrant is *per se* unreasonable unless the search falls within a well-delineated exception to the warrant requirement involving exigent circumstances." *State v. Cooke*, 306 N.C. 132, 135, 291 S.E.2d 618, 620 (1982). "Our state constitution, like the Federal Constitution, requires the exclusion of evidence obtained by unreasonable search and seizure." *State v. Carter*, 322 N.C. 709, 712, 370 S.E.2d 553, 555 (1988).

Decisions of the United States Supreme Court require that the police obtain a search warrant before searching a home " 'subject only to a few specifically established and well delineated exceptions.' " *Thompson v. Louisiana*, 469 U.S. 17, 19-20, 83 L. Ed. 2d 246, 250 (1984) (quoting *Katz v. United States*, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 585 (1967)). In creating exceptions to the general rule, this Court must consider the " 'balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " *Mincey v. Arizona*, 437 U.S. 385, 406, 57 L. Ed. 2d 290, 309 (1978) (Rehnquist, J., concurring) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 45 L. Ed. 2d 607, 615 (1975)).

In *Mincey v. Arizona*, the United States Supreme Court reaffirmed the right of police to conduct a warrantless search and seizure when an emergency exists, stating:

We do not question the right of police to respond to emergency situations. . . . [T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they

reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises.

*Id.* at 392-93, 57 L. Ed. 2d at 300 (citations omitted).

In the instant case, the officer was on defendant's premises investigating a missing person report. The initial responding officer knocked on the front door. It was only after the officer received no response that he noticed the green flies. The officer then went to the rear of the house and again noticed green flies, this time accompanied by the smell of rotting flesh. The officer leaned into the crawl space under the house from which the green flies and the odor emanated and looked around with his flashlight. During this inspection, the officer found Funderburke's body. Immediately thereafter, the officer secured the scene against intruders and called for assistance. Investigators arrived shortly thereafter. Responding to the ongoing emergency, the investigators conducted a protective sweep of the house which could have revealed additional victims or hiding suspects. During the protective sweep of the home, the officers found defendant inside the residence. However, investigators did not conduct a more complete search of the residence until a search warrant was obtained.

"It must always be remembered that what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Elkins v. United States*, 364 U.S. 206, 222, 4 L. Ed. 2d 1669, 1680 (1960). "[I]n determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 19-20, 20 L. Ed. 2d 889, 905 (1968). The United States Supreme Court stated in *United States v. Cortez*, 449 U.S. 411, 418, 66 L. Ed. 2d 621, 629 (1981), that a court analyzing conclusions made by a trained officer should consider the circumstances "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." This Court has also held that the circumstances leading to a seizure should be viewed, not in isolation, but as a whole, " 'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.' " *State v. Thompson*, 296 N.C. 703, 706, 252 S.E.2d 776, 779 (quoting *United States v. Hall*, 525 F.2d 857, 859 (D.C. Cir. 1976), *cert. denied*, 444 U.S. 907, 62 L. Ed. 2d 143 (1979)).

STATE v. SCOTT

[343 N.C. 313 (1996)]

In the instant case, Davis was a trained officer faced with a potential emergency situation. During *voir dire* at the suppression hearing, Davis testified that he had been employed with the Burlington Police Department for twenty-three years and that, prior to becoming a police officer, he had served as a member of the armed forces in Vietnam for one year. Davis testified that, both as a soldier and as a police officer, he had experienced smelling decaying flesh. He further testified that on one occasion while investigating a missing person's report, he found a body and smelled a "strong, strong odor" of decaying flesh. Upon further investigation, he found that the person was alive and that "the subject's feet were rotting."

We conclude that the search of the crawl space under defendant's home was not within the meaning of the Fourth Amendment's prohibition against unreasonable searches and seizures. We believe that Davis' response to the potential emergency situation was reasonable under the circumstances. Viewing the search in the instant case through the eyes of a reasonable and cautious police officer on the scene, guided by Davis' experience and training, we do not believe that the search of the crawl space was unreasonable.

We further conclude that the subsequent search of the residence pursuant to the search warrant was reasonable and that the statements of defendant were not taken as a result of any illegal search. The law enforcement officers' search of the house here complies with *Mincey*, which allows warrantless searches in emergency circumstances to determine if there are other victims or suspects still on the premises. Once the officer had found the body of Ms. Funderburke under the house—suggested by the presence of flies and the smell of decaying flesh—he was confronted with a potential emergency. He had reason to believe that an injured person might be in the house or that the perpetrator was in the house and would be dangerous if the perpetrator's presence was unknown. Accordingly, we reject defendant's second argument.

[3] In his third argument, defendant contends he is entitled to a new trial because the trial court erroneously admitted irrelevant evidence of Funderburke's physical injuries and appearance at various times between 1978 and 1993. Defendant filed pretrial motions to exclude evidence of any alleged prior acts of misconduct or other crimes. He sought to exclude any references to Funderburke's appearance or injuries prior to her death, on the grounds that the source of those injuries was unknown and there was no evidence connecting defend-

ant to those injuries. In response, the trial judge ordered the prosecutor not to elicit the evidence before the jury until the admissibility was examined in *voir dire*. Defendant's objections to the introduction into evidence of medical records and testimony by the shelter director, police officers, a family abuse services director, a motel clerk, a grocery clerk, and a grocery store manager were overruled. The trial court also overruled defendant's objections to the admission into evidence of photographs showing Funderburke's injuries and bruised physical appearance. This evidence showed a myriad of injuries to Funderburke which were inflicted over a lengthy period of time before the murder.

" 'Evidence of another offense is admissible under Rule 404(b) so long as it is relevant to any fact or issue other than the character of the accused.' " *State v. Bryant*, 337 N.C. 298, 308, 446 S.E.2d 71, 77 (1994) (quoting *State v. Simpson*, 327 N.C. 178, 185, 393 S.E.2d 771, 775 (1990)). In *State v. Weathers*, 339 N.C. 441, 448, 451 S.E.2d 266, 270 (1994), we said:

> Under Rule 404(b), evidence of other crimes, wrongs, or acts is admissible for purposes other than to prove the character of a person or to show that he acted in conformity therewith. Such other purposes include "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C.G.S. § 8C-1, Rule 404(b) (1992). The aforementioned list is not exclusive and "the fact that evidence cannot be brought within a category does not necessarily mean that the evidence is inadmissible." *State v. DeLeonardo*, 315 N.C. 762, 770, 340 S.E.2d 350, 356 (1986). In *State v. Coffey*, 326 N.C. 268, 389 S.E.2d 48 (1990), this Court definitively stated that Rule 404(b) is a rule of *"inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *Coffey*, 326 N.C. at 278-79, 389 S.E.2d at 54.

In *State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118, *cert. denied*, — U.S. —, 126 L. Ed. 2d 341 (1993), we concluded that "the testimony about defendant's misconduct toward his wife was proper under Rule 404(b) to prove motive, opportunity, intent, preparation, absence of mistake or accident with regard to the subsequent fatal attack upon her." *Id.* at 376, 428 S.E.2d at 132.

" 'In the domestic relation, the malice of one of the parties is rarely to be proved but from a series of acts; and the longer they have existed and the greater the number of them, the more powerful are they to show the state of [the defendant's] feelings.' " *State v. Moore*, 275 N.C. 198, 207, 166 S.E.2d 652, 658 (1969) (quoting *State v. Rash*, 34 N.C. 382, 384 (1851)). Specifically, evidence of frequent quarrels, separations, reconciliations, and ill-treatment is admissible as bearing on intent, malice, motive, premeditation, and deliberation. *Moore*, 275 N.C. at 206-07, 166 S.E.2d at 658.

For these reasons, we conclude that the testimony about defendant's frequent arguments with, violent acts toward, separations from, reconciliations with, and threats to Funderburke was admissible under N.C.G.S. § 8C-1, Rule 404(b) to prove issues he disputed, such as lack of intent, malice, premeditation, and deliberation, notwithstanding that some of the incidents dated back some years. We further conclude that defendant "opened the door" to the introduction of this evidence by stating that he and Funderburke had a loving relationship. *See State v. Sexton*, 336 N.C. 321, 360, 444 S.E.2d 879, 901 (where one party introduces evidence of a particular fact, the opposing party may introduce evidence to explain or rebut that fact), *cert. denied*, — U.S. —, 130 L. Ed. 2d 429 (1994). Accordingly, we reject defendant's third argument.

[4] In his fourth argument, defendant contends he is entitled to a new trial because the trial court erroneously admitted the State's inadmissible and irrelevant hearsay evidence of Funderburke's statements made to medical personnel, police officers, a motel clerk, a shelter director, friends, and family members. Defendant filed a pretrial motion to exclude all hearsay evidence of Funderburke's out-of-court statements to these State witnesses. The trial judge ordered the prosecutor not to elicit such information before the jury. After a *voir dire* of each witness, the testimony was admitted under Rules 803(1)-(4) and 804(b)(5). The statements, introduced through the testimony of medical personnel, police officers, a motel clerk, a shelter director, friends, and family members, consisted of Funderburke's accounts that defendant had caused her injuries, that she often hid from defendant, and that she was afraid of defendant.

Cindy Cothran, the director of medical records at Alamance Memorial Hospital and Alamance County Hospital, was allowed to testify about statements made by Funderburke to physicians and nurses which were recorded during approximately twelve visits to the

local hospitals from 12 August 1978 until 26 March 1993. The records contained notations that defendant had caused Funderburke's injuries. Defendant argues that it is unclear whether Funderburke actually made the statements written in the record or whether the records simply reflected the opinions of the medical personnel since the statements were not attributed to Funderburke. Also, defendant argues that the assailant's identity is seldom pertinent to diagnosis and, therefore, is not ordinarily admitted under Rule 803(4).

In the instant case, Cothran testified about several occasions when Funderburke told physicians that defendant had beaten her repeatedly or assaulted her with his hands and feet. Cothran further testified as to the diagnosis and treatment of Funderburke on each of the occasions she went to the hospital as a result of the assaults by defendant. At the *voir dire*, defendant conceded the admissibility of the medical records, except as to certain coded entries. The trial court asked counsel to object as appropriate during Cothran's testimony. Defendant did not object to any of Cothran's testimony and does not argue plain error on this appeal.

"In criminal cases, a question which was not preserved by objection noted at trial and which is not deemed preserved by rule or law without any such action[] nevertheless may be made the basis of an assignment of error where the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C. R. App. P. 10(c)(4). Since defendant did not object at trial or allege plain error, he has failed to properly preserve this issue for appeal. *State v. Moseley*, 338 N.C. 1, 36, 449 S.E.2d 412, 433-34 (1994), *cert. denied*, — U.S. —, 131 L. Ed. 2d 738 (1995); N.C. R. App. P. 10(c)(4).

[5] Defendant next argues that the trial court improperly admitted notes of Della Nickerson, an employee of the Family Abuse Services of Alamance County and director of a home for abused women and children. Nickerson testified for the State about several instances when Funderburke was provided shelter at the home for abused women and children. The shelter provides a support group for battered women.

On 11 April 1988, Funderburke became a resident of the shelter. She completed an intake application form at Nickerson's request and in Nickerson's presence. The form was comprised of such matters as the abused person's background and condition. Nickerson testified that the intake form is filled out in the regular course of business at the shelter and is used by counselors when working with residents.

Prior to Nickerson's being called as a witness in front of the jury, the trial court conducted a *voir dire* on the admissibility of the intake form completed by Funderburke on 11 April 1988. Defendant argued that the form contained inadmissible hearsay statements. After entertaining arguments from defendant and the State, the trial court ruled that the intake form was admissible under Rule 803(4) and Rule 803(6) of the North Carolina Rules of Evidence.

We agree with the trial court that the intake form was admissible under Rule 803(6). In *State v. Wilson*, 313 N.C. 516, 533, 330 S.E.2d 450, 462 (1985), we said:

> Business records made in the ordinary course of business at or near the time of the transaction involved are admissible as an exception to the hearsay rule if they are authenticated by a witness who is familiar with them and the system under which they are made. *State v. Wood*, 306 N.C. 510, 294 S.E.2d 310 (1982); *State v. Galloway*, 304 N.C. 485, 284 S.E.2d 509 (1981). The authenticity of such records may, however, be established by circumstantial evidence. *See State v. Davis*, 203 N.C. 13, 164 S.E. 737, *petition for reconsideration dismissed*, 203 N.C. 35, 164 S.E. 737, *cert. denied*, 287 U.S. 649[, 77 L. Ed. 561] (1932). There is no requirement that the records be authenticated by the person who made them. *State v. Carr*, 21 N.C. App. 470, 204 S.E.2d 892 (1974). *See State v. Franks*, 262 N.C. 94, 136 S.E.2d 623 (1964). Furthermore, if the records themselves show that they were made at or near the time of the transaction in question, the authenticating witness need not testify from personal knowledge that they were made at that time. *State v. Carr*, 21 N.C. App. 470, 204 S.E.2d 892 (1974).

Defendant contends the evidence was not admissible as a record kept in the course of a regularly conducted business activity since each participant must be acting in the course of a regularly conducted business activity. Defendant argues that the intake form was personally completed by Funderburke, rather than an employee of the shelter, and that, therefore, it was not admissible under Rule 803(6). We disagree.

Rule 803(6) of the North Carolina Rules of Evidence provides:

> (6)   Records of Regularly Conducted Activity.—A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, *made at or near*

*the time by, or from information transmitted by, a person with knowledge,* if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

N.C.G.S. § 8C-1, Rule·803(6) (1992) (emphasis added).

The trial court found as fact that Nickerson testified that the intake form was completed in the "regular and normal course of business"; that it was kept as "a regular practice of the activity of the family abuse service"; that Funderburke completed the intake form on 11 April 1988, after being in the shelter for two days; that Funderburke completed the form in her own handwriting; that Nickerson observed Funderburke complete the form; and that the intake form is "normally kept by the Family Abuse Service of Alamance County . . . in a safe place as a record of the activity and the people coming in as residents in this abuse shelter." Accordingly, the trial court concluded that the evidence was admissible under Rule 803(6) of the North Carolina Rules of Evidence.

We conclude that the findings of fact were supported by the evidence and that the findings supported the conclusions of law. Since the record was made by Funderburke, a person with knowledge, at or near the time she entered the shelter, we hold that the trial court did not err in admitting the intake form under Rule 803(6) of the North Carolina Rules of Evidence as a business record made in the ordinary course of business.

[6] Defendant further contends, relying on N.C.G.S. § 8C-1, Rule 803(3), that the trial court erroneously admitted hearsay statements by Funderburke that she had been beaten by defendant. Defendant specifically challenges the testimony from nine of the State's witnesses: Janie DeMarra, Betsy Watkins, Stacy Strader, Gina Anderson, Dwayne Harden, Rhiana Skeens, David Allen, Teddy Somers, and B.T. Holland. The testimony of these witnesses was generally to the effect that Funderburke had told these witnesses that defendant had caused her injuries in the past, that she often hid from defendant, and that she was afraid of defendant.

## STATE v. SCOTT

[343 N.C. 313 (1996)]

After a *voir dire* of the nine witnesses, the trial court admitted the statements into evidence on the grounds that the statements showed Funderburke's then-existing state of mind pursuant to an exception to the hearsay rule found in Rule 803(3) and that Funderburke's state of mind was relevant to show the state of her relationship with defendant. Defendant contends that the trial court erred in this regard because Funderburke's state of mind was not relevant to the case at hand.

It is well established in North Carolina that a murder victim's statements falling within the state of mind exception to the hearsay rule are highly relevant to show the status of the victim's relationship to the defendant. *State v. McHone*, 334 N.C. 627, 637, 435 S.E.2d 296, 301-02 (1993) (state of mind relevant to show a stormy relationship between victim and defendant prior to the murder), *cert. denied*, — U.S. —, 128 L. Ed. 2d 220 (1994); *State v. Lynch*, 327 N.C. 210, 222, 393 S.E.2d 811, 818-19 (1990) (defendant's threats to victim shortly before the murder admissible to show victim's then-existing state of mind); *State v. Cummings*, 326 N.C. 298, 313, 389 S.E.2d 66, 74 (1990) (victim's statements regarding defendant's threats relevant to the issue of her relationship with defendant).

After a thorough review of the record, we conclude that the conversations between Funderburke and the nine witnesses related directly to Funderburke's fear of defendant and that Funderburke's statements were properly admitted pursuant to the state of mind exception to the hearsay rule to show the nature of Funderburke's relationship with defendant. Accordingly, we reject defendant's fourth argument.

[7] In his fifth argument, defendant contends he is entitled to a new trial because the trial court erroneously admitted inadmissible "other crimes" evidence that defendant threatened to shoot police officers in March 1990. Defendant argues that this evidence was irrelevant and inadmissible because it was introduced to show that he is a violent man who had threatened to kill innocent police officers in the past.

On direct examination, Billy, defendant and Funderburke's son, testified that Funderburke and defendant often played loud music. On cross-examination, defendant asked if the police had ever come in response to the music, to which Billy responded in the affirmative. On redirect examination, the following exchange took place between the prosecutor and Billy:

Q. Now, [defense counsel] asked you about a time when, that the police used to come to the house because of the loud music. Do you remember that question?

A. Yes, sir.

Q. And that did happen from time to time, didn't it?

A. Yes, sir.

Q. And it happened in . . . March of 1990, didn't it, Billy, when the police stood outside the house for an hour and a half before you finally came outside? Is that right?

A. Yes, sir.

Q. And they stayed outside the house that long because your father threatened to shoot the officers if they came in the house didn't she [sic]?

[DEFENSE COUNSEL]: Objection.

DEFENDANT SCOTT: That's a lie.

COURT: Objection over-ruled. You may answer the question. It's redirect on cross. You may answer the question.

A. He might have said that. I was in my bedroom at the time.

Assuming *arguendo* that Billy's response was accepted by the jury as a positive response to the prosecutor's question and that it was error to admit the question and answer, we are not convinced that the error was prejudicial. Similar evidence was admitted without objection at several other times during the trial. An officer testified without objection about the concern the police had because of defendant's violent nature if he had been drinking. Evidence was offered about defendant's attempting to intimidate officers, which rendered back-up appropriate when the police had to confront him. The evidence indicated that several police cars would arrive whenever an officer had to be dispatched to the defendant's residence. Billy's testimony simply corroborated the police officers' accounts and explained the officers' behavior on the day the body was discovered. Under these circumstances, defendant has not met his burden of establishing prejudice by showing that there is a reasonable possibility that had the error in question not been committed, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (1988).

STATE v. SCOTT

[343 N.C. 313 (1996)]

**[8]** In his sixth argument, defendant contends he is entitled to a new trial because the trial court erroneously admitted Gina Anderson's "non-corroborative and inadmissible" hearsay testimony about what Billy allegedly told her. Billy testified that he found his sister's, Gina Anderson's, telephone number in some papers in his parents' bedroom and that he telephoned her to tell her that their mother was missing. However, Billy did not testify that he thought defendant had burned some important papers. When Anderson testified later in the trial, she stated that Billy told her that he thought defendant had burned some important papers since he could not find her phone number. Defendant objected and moved to strike Anderson's response. The trial judge then instructed the jurors that if they found the testimony to be corroborative of Billy's testimony, they should consider it; otherwise, they must disregard it. Assuming *arguendo* that the trial court erred in overruling defendant's objection and denying the motion to strike, we conclude that the limiting instruction made any error nonprejudicial. N.C.G.S. § 15A-1443(a); *cf. State v. Williams*, 341 N.C. 1, 11, 459 S.E.2d 208, 214-15 (1995).

**[9]** In his seventh argument, defendant contends he is entitled to a new trial because the trial court erroneously allowed the prosecutor to elicit inadmissible "other crimes" evidence on cross-examination of defense witness Manley May that defendant had a substance abuse problem.

During direct examination, May testified that defendant and Funderburke were not involved that much in alcohol when they lived in Charlotte or when they first moved to Alamance County. On cross-examination, the prosecutor asked whether defendant had a substance abuse problem. The court overruled defendant's objection that this question exceeded the scope of direct examination because the direct examination elicited testimony about defendant's alcohol use and not his drug use. Defendant argues that this evidence was irrelevant and unfairly prejudicial since there was no evidence from any other source during the trial that he used illegal drugs. Therefore, defendant argues that the evidence was highly inflammatory and was introduced to show that defendant was a bad person.

We conclude that the trial court did not err in overruling defendant's objection. The question elicited only whether defendant had a substance abuse problem. There was nothing improper about this question. We first note that defendant did not object to May's response that, "[o]n several occasions, [defendant] and I smoked mar-

STATE v. SCOTT

[343 N.C. 313 (1996)]

ijuana." We also note that there was already evidence presented through defense witness David Byrd that defendant smoked marijuana and drank beer. Additionally, we note that May testified on direct examination that "smoking and drinking wasn't a part of [defendant's] lifestyle until in recent years." Therefore, we conclude that the trial court properly overruled defendant's objection on the basis that the subject "was brought up on direct examination, so he can ask about it on cross." Accordingly, we reject defendant's seventh argument.

**[10]** In his eighth argument, defendant contends he is entitled to a new trial because the trial court erroneously allowed the prosecutor to improperly impeach defense witness May. May had testified that, on 2 July 1993, Funderburke stated that she wanted to die. This testimony, according to defendant, supported his account that it was an accident. The prosecutor impeached May with evidence that May was in the Alamance County jail in July 1993. May testified on direct examination that he had talked to Funderburke on 2 July 1993. During the conversation, she said that she wanted to bring him some writing paper, stamps, and other items but that she was unable to bring them. On cross-examination, the prosecutor asked, "When you talked to Funderburke for an hour and a half you said to send you writing materials and stamps, that's because you were in prison and need[ed] those?"

We conclude that defendant opened the door by asking about May's request that Funderburke bring paper and writing instruments to him. A question arose naturally and logically as to why she needed to bring him those items. Evidence of the circumstances behind May's request for Funderburke to bring him paper and writing instruments was admissible to provide a complete picture for the jury.

> [I]t remains true that the North Carolina practice is quite liberal and, under it, cross-examination may ordinarily be made to serve three purposes: (1) *to elicit further details of the story related on direct, in the hope of presenting a complete picture less unfavorable to the cross-examiner's case*; (2) to bring out new and different facts relevant to the whole case; and (3) to impeach the witness, or cast doubt upon her credibility.

Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 170 (4th ed. 1993) (emphasis added). It was not prejudicial error to admit this testimony. Accordingly, we reject defendant's eighth argument.

**[11]** In his ninth argument, defendant contends he is entitled to a new trial because the trial court erred in allowing the prosecutor to conduct an improper, insulting, and impertinent cross-examination of him that could not possibly have elicited relevant evidence. On cross-examination of defendant, the prosecutor asked defendant seven questions to which defendant assigns error. Defendant did not object at trial to five of these questions but argues plain error regarding these questions on this appeal. As we have stated previously:

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "*fundamental* error, something so basic, so prejudical, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the . . . mistake had a probable impact on the jury's finding that the defendant was guilty."

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.) (footnote omitted), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)), *quoted in State v. Weathers*, 339 N.C. 441, 450, 451 S.E.2d 266, 271. Even assuming *arguendo* that the prosecutor's questions were improper and that the trial court erred in not intervening *ex mero motu* to limit the scope of the prosecutor's cross-examination of defendant, we conclude that the court's error did not amount to plain error and did not result in manifest injustice.

Defendant objected to two of the seven questions to which he assigns error: (1) whether defendant called Funderburke's daughter Gina Anderson a "whore" and "useless" on the telephone and (2) whether defendant told Anderson in the 1980s that she would never see Billy if she left home. Defendant contends these questions were improper because they did not elicit relevant evidence and were designed to humiliate and unfairly badger him. We disagree.

In *State v. Bronson*, 333 N.C. 67, 79, 423 S.E.2d 772, 779 (1992), we said:

> The bounds of cross-examination are limited by two general principles: 1) the scope of the cross-examination rests within the

sound discretion of the trial judge; and 2) the questions must be asked in good faith. *State v. Warren*, 327 N.C. 364, 373, 395 S.E.2d 116, 121-22 (1990) (citations omitted). A prosecutor's questions are presumed to be proper unless the record shows that they were asked in bad faith. *State v. Dawson*, 302 N.C. 581, 586, 276 S.E.2d 348, 351 (1981). Abuse of discretion is generally found when a prosecutor affirmatively places before the jury an incompetent and prejudicial matter by injecting his own knowledge, beliefs, or personal opinions or facts which are either not in evidence or not admissible. *Id.* at 585-86, 276 S.E.2d at 351.

In the instant case, the prosecutor did not place before the jury his own opinions or inadmissible evidence, and there is nothing tending to show that the testimony was elicited in bad faith or that the questioning exceeded the scope of permissible cross-examination. Accordingly, we find no abuse of discretion on the part of the trial court and no reversible error.

**[12]** In his tenth argument, defendant contends that the trial court erred in denying his motion to dismiss the first-degree murder charge because there was insufficient evidence of premeditation and deliberation. We disagree. Defendant argues that there is not a scintilla of direct evidence of premeditation and deliberation. Defendant further argues that the State did not present any evidence about events immediately preceding the shooting or at the time of the shooting; did not present any evidence about how the shooting occurred; and did not produce even a single witness who purported to have direct, eyewitness, or even hearsay evidence that defendant acted with premeditation and deliberation. Specifically, defendant argues that the State did not present a scintilla of evidence that defendant obtained the shotgun, released the safety, or pulled the trigger.

In *State v. Davis*, 340 N.C. 1, 11-12, 455 S.E.2d 627, 632, *cert. denied*, — U.S. —, 133 L. Ed. 2d 83 (1995), we said:

The motion to dismiss must be allowed unless the State presents substantial evidence of each element of the crime charged. *State v. McDowell*, 329 N.C. 363, 407 S.E.2d 200 (1991). "Substantial evidence" means " 'that the evidence must be existing and real, not just seeming or imaginary.' " *State v. Clark*, 325 N.C. 677, 682, 386 S.E.2d 191, 194 (1989) (quoting *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980)). In evaluating a motion to dismiss, the trial court must consider the evidence in the light

STATE v. SCOTT

[343 N.C. 313 (1996)]

most favorable to the State, allowing every reasonable inference to be drawn therefrom. *State v. Locklear*, 322 N.C 349, 368 S.E.2d 377 (1988).

In defining premeditation and deliberation, this Court has stated:

"Premeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence. . . . Instead, they usually must be proved by circumstantial evidence. Among other circumstances to be considered in determining whether a killing was with premeditation and deliberation are: (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner."

*State v. Small*, 328 N.C. 175, 181-82, 400 S.E.2d 413, 416 (1991) (quoting *State v. Brown*, 315 N.C. 40, 58-59, 337 S.E.2d 808, 822-23 (1985) (citations omitted), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988)).

In the instant case, viewing the evidence in a light most favorable to the State, the evidence tended to show that defendant and Funderburke had a hostile relationship. There is no evidence that Funderburke struggled or provoked defendant. Defendant lied to everyone about Funderburke's whereabouts and did not call the police or emergency medical personnel. Defendant hid Funderburke's body under his residence. Funderburke was shot at close range by a shotgun, and the medical examiner testified that it was highly improbable that defendant's claim that Funderburke committed suicide was accurate. We conclude that the evidence was sufficient to show premeditation and deliberation. Accordingly, defendant's tenth argument is rejected.

[13] In his eleventh argument, defendant contends that the trial court committed reversible error by failing to instruct the jury on voluntary intoxication as a defense to first-degree murder. We disagree.

In *State v. Herring*, 338 N.C. 271, 275, 449 S.E.2d 183, 186 (1994), we said:

> A defendant who wants to raise the issue of whether he was so intoxicated by the voluntary consumption of alcohol or other drugs "that he did not form a deliberate and premeditated intent to kill has the burden of producing evidence, or relying on the evidence produced by the state, of his intoxication." *State v. Mash*, 323 N.C. 339, 346, 372 S.E.2d 532, 536 (1988). "Evidence of mere intoxication" does not meet this burden. *Id.* The defendant "must produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill." *Id.* The evidence on which the defendant relies
>
>> must show that at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill. *State v. Shelton*, 164 N.C. 513, 79 S.E. 883 (1913)[, *overruled on other grounds by State v. Oates*, 249 N.C. 282, 106 S.E.2d 206 (1958)]. In absence of some evidence of intoxication to such degree, the court is not required to charge the jury thereon. *State v. McLaughlin*, 286 N.C. 597, 213 S.E.2d 238 (1975)[, *death sentence vacated*, 428 U.S. 903, 49 L. Ed. 2d 1208 (1976)].
>
> *Mash*, 323 N.C. at 346, 372 S.E.2d at 536 (quoting *State v. Strickland*, 321 N.C. 31, 41, 361 S.E.2d 882, 888 (1987)).

Defendant contends that the evidence in this case showed that he and Funderburke often went drink-for-drink, that he and Funderburke drank a gallon of vodka within five and a half hours, that he could not remember some of the details before the shooting, and that Funderburke had a blood-alcohol concentration of .40. Defendant therefore argues that, allowing for his size, he must have had a blood-alcohol concentration of at least .30. Further, defendant argues that his behavior after the murder was erratic and suggests he was intoxicated.

Viewing the evidence in the light most favorable to defendant, the evidence shows that defendant may have been highly intoxicated, but the evidence does not show defendant was utterly incapable of forming a deliberate and premeditated purpose to kill. We conclude that defendant has not met his burden of showing that he was utterly inca-

pable of forming the requisite intent. For this reason, we reject defendant's eleventh argument and hold that the trial court did not err in refusing to submit a voluntary intoxication charge to the jury.

**[14]** In his twelfth argument, defendant contends that the trial court erred by failing to intervene *ex mero motu* and instruct the jury to disregard several statements made by the prosecutor during closing arguments at trial. Defendant contends he is entitled to a new trial because the prosecutor improperly called defendant a liar and misstated the evidence. During closing arguments, the prosecutor made the following statements: "[B]ut he did to them [his family] what I contend to you he did in this courtroom the other day. He lied." The prosecutor also argued, "[I]ts a lie. He has to lie." Further, the prosecutor argued:

> [I]f you believe defendant and if the shooting was an accident, why lie to your sister on Saturday? Why lie to your son on Monday more than once? Why lie to [Bunting]? Why would he lie to the police, not once but several times? Think maybe you lie because you hadn't figured out what you're going to tell to try to get yourself off? Do you think you might lie when your conscience is full of guilt and you got to figure out a way out of it? . . . We showed that you are a murderer by the people that you lied to.

Defendant argues that the prosecutor should not have been allowed to comment on the truth or falsity of the evidence.

Defendant also complains that the prosecutor stated that defendant had beaten Funderburke, even though Funderburke recanted these allegations. The prosecutor also stated that Funderburke said that defendant told her that he was "going to kill her." Defendant argues that there was no evidence presented to this effect. Thus, defendant contends that through this argument, the prosecutor manufactured two inflammatory and highly prejudicial pieces of evidence.

The arguments of counsel are left largely to the control and discretion of the trial judge, and counsel will be granted wide latitude in the argument of hotly contested cases. *State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487 (1992). "Counsel is permitted to argue the facts which have been presented, as well as reasonable inferences which can be drawn therefrom." *State v. Williams*, 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986). "Because defendant did not object to the portions of the argument to which he now assigns error, 'review is lim-

ited to an examination of whether the argument was so grossly improper that the trial [court] abused [its] discretion in failing to intervene *ex mero motu.*' " *State v. McNeil,* 324 N.C. 33, 48, 375 S.E.2d 909, 924 (1989) (quoting *State v. Gladden,* 315 N.C. 398, 417, 340 S.E.2d 673, 685, *cert. denied,* 479 U.S. 871, 93 L. Ed. 2d 166 (1986)) (alteration in original), *sentence vacated on other grounds,* 494 U.S. 1050, 108 L. Ed. 2d 756 (1990).

With reference to the prosecutor's argument that defendant had lied, we note that a prosecutor may properly argue to the jury that it should not believe a witness. *State v. McKenna,* 289 N.C. 668, 687, 224 S.E.2d 537, 550, *death sentence vacated,* 429 U.S. 912, 50 L. Ed. 2d 278 (1976). When read in context, the prosecutor's argument was no more than an argument that the jury should consider defendant's credibility since he had lied about Funderburke's whereabouts before her body was found. In view of the several conflicting statements made by defendant in this case, we conclude that the prosecutor's jury argument was not so grossly improper as to require the trial court's intervention *ex mero motu.*

As to the prosecutor's comments concerning the assault against Funderburke, the prosecutor said:

And in February of '91, she gets a broken finger, a broken arm, broken ribs, and large bruises because this defendant is trying to force her to dance. Now, she doesn't say anything at all in her medical records on that, the next day that there was any dancing going on or any falling off any barstool. She changes that later after the police reinjure [sic] the arm. She says [that] after the defendant takes her down there and want[s] to get a lawsuit going. She does change it. She changes it in court. That's not what she said that night, that night to the next day at the police department. She said patient was assaulted by boyfriend.

The prosecutor did mix up two assaults on Funderburke. One took place in February of 1991, and Funderburke did not go to the hospital. However, the comment that "patient was assaulted by boyfriend" obviously relates to an incident where Funderburke talked to a doctor, not the police. After a January 1991 incident, Funderburke did go to the hospital. The prosecutor simply mixed up the incidents. This mix-up was slight, and the error could not have possibly been prejudicial to the defendant. As for the prosecutor's argument that defendant threatened Funderburke, there was testimony by Officer Holland that the defendant said he was going to kill her if she proceeded with

the charges. Therefore, we conclude that the prosecutor's argument was not so grossly improper as to require the trial judge to intervene *ex mero motu* during the prosecutor's closing argument.

**[15]** Finally, in his thirteenth argument, defendant contends he is entitled to a new trial because the trial court erred in failing to instruct the jury on involuntary manslaughter. The trial court submitted three possible verdicts to the jury: (1) guilty of first-degree murder, (2) guilty of second-degree murder, and (3) not guilty. Defendant concedes that this Court recently held in *State v. Jones,* 339 N.C. 114, 451 S.E.2d 826 (1994), *cert. denied,* — U.S. —, 132 L. Ed. 2d 873 (1995), that where a jury is properly instructed on the elements of first- and second-degree murder and thereafter returns a verdict of guilty of first-degree murder based on premeditation and deliberation, any error in the trial court's failure to instruct the jury on involuntary manslaughter is harmless even if the evidence would have supported such an instruction. *Id.* at 148-49, 451 S.E.2d at 844; *accord State v. Lyons,* 340 N.C. 646, 459 S.E.2d 770 (1995); *State v. Hardison,* 326 N.C. 646, 392 S.E.2d 364 (1990); *State v. Young,* 324 N.C. 489, 380 S.E.2d 94.

Defendant urges this Court to abandon this precedent because it violates the Fourteenth Amendment, is poor public policy, and is unfair to defendants. However, we have carefully considered defendant's argument and find no compelling reason to depart from our precedent. Accordingly, we reject defendant's final argument.

For the foregoing reasons, we hold that defendant received a fair trial, free of prejudicial error.

NO ERROR.